CULLEN & DYKMAN LLP
Thomas R. Slome
Amanda A. Tersigni
100 Quentin Roosevelt Boulevard
Garden City, NY 11530
(516) 357-3700
tslome@cullenllp.com
atersigni@cullenllp.com

*Counsel for 514 Fioto Property Corp.*
*and 518 Metropolitan Avenue Corp.*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In re:

SID BOYS CORP.,

                       Debtor.
-------------------------------------------------------------X

Chapter 11

Case No.: 21-42207-ess

## MOTION OF 514 FIOTO PROPERTY CORP. AND 518 METROPOLITAN AVENUE CORP. FOR AN ORDER (I) DIRECTING DEBTOR TO IMMEDIATELY SURRENDER PREMISES DUE TO DEEMED REJECTIOIN OF NON-RESIDENTIAL REAL PROPERTY LEASE AND (II) CONVERTING THE DEBTOR'S CHAPTER 11 CASE TO A CASE UNDER CHAPTER 7

514 Fioto Property Corp. ("Landlord"), the landlord of the premises (the "Premises") at which the debtor Sid Boys Corp. ("Debtor") operates its diner business (the "Diner" or "Diner Business"), by and through its undersigned counsel, respectfully submits this Motion for an Order (I) pursuant to 11 U.S.C. § 365(d)(4)(A) directing the Debtor to immediately surrender the Premises to the Landlord due to the expiration of the Debtor's time to assume or reject the non-residential lease for the Premises (the "Lease") and the Lease's deemed rejection, and (II) pursuant to 11 U.S.C. § 11 l 2(b) converting the Debtor's chapter 11 case to a case under chapter 7 (the "Motion"). In support of its Motion, Landlord[1] and 518 Metropolitan respectfully allege as follows:

---

[1] Landlord's affiliate, 518 Metropolitan Avenue Corp. ("518 Metropolitan" and, with Landlord, the "Movants"), which is owed approximately $1.4 million, joins in the Motion's request for conversion of this case to chapter 7.

## JURISDICTION AND VENUE

1.      The Court has subject matter jurisdiction over this Motion under and pursuant to 28 U.S.C. §§ 157 and 1334.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3.      Venue of this motion is proper in this District under and pursuant to 28 U.S.C. § 1409.

4.      The statutory bases for the relief requested in the Motion pursuant to 11 U.S.C. §§ 105(a), 365(d)(4)(A) and 1112(b).

## PRELIMINARY STATEMENT

5.      The Debtor's Lease for the Premises was deemed rejected by operation of law on or about March 28, 2022, after 210 days had elapsed since the order for relief in this case, which was when the Debtor filed its chapter 11 petition on August 28, 2021 (the "Petition Date").  No motion to extend that deadline has been filed, and the law is clear that absent a motion for such relief being filed before the expiration of the time to assume or reject a lease for non-residential real property, the lease is deemed rejected, and there can be no *nunc pro tunc* extension of such time.  Further, the Bankruptcy Code and case law are crystal clear that upon the deemed rejection, the debtor irrevocably loses any state law possessory rights in the lease and is under an affirmative duty to "immediately surrender that non-residential real property to the lessor."  11 U.S.C. § 365(d)(4)(A).  Despite being made aware of its duty to immediately surrender the Premises to Landlord on April 4, 2022 by letter to Debtor's counsel, the Debtor is ignoring the statutory directive.  Accordingly, Landlord asks this Court for an order compelling the Debtor to comply with its clear and unambiguous obligation under the law.

6.     The Movants also request an order converting the Debtor's case to chapter 7 for "cause."  Cause is present here in many forms, each one independently requiring conversion of this case, including:  (a) without any further rights in the Lease, it is impossible for the Debtor to effectuate a plan; (b) the estate is incurring substantial or continuing losses and the longer such losses continue, the less of the remaining half million dollars of the Debtor's approximate $500,000 in a Payroll Protection Plan ("PPP") and $600,000 in Restaurant Revitalization Funds, will be available for distribution to creditors; (c) the Debtor is failing to comply with directives of the Court and its responsibilities under the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules; (d) a trustee should be appointed to "investigate the financial affairs of the debtor," including where over $1 million in government aid that could have been used for rent and to repay debt service went, and "expeditiously" liquidate the estate's property and distribute the proceeds to creditors,[2] something sorely needed in this case.

## FACTUAL BACKGROUND

7.     On August 28, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.  No request has been made for the appointment of a trustee or examiner, and the Debtor continues to operate its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.     The Landlord was and is owned in equal shares by three brothers (or in the case of two of them, their decedents estates):  Frank Fiotos (age 69), the estate of Fiotodimitrakis Fiotos (who passed last year at age 75), and the estate of Antonios (Tony) Fiotodimitrakis (who passed two years ago at age 72) (the brothers and/or the deceased brothers' estates are referred to collectively as the "Fiotos Brothers" or the "Brothers," and individually as "Frank," "John," or "Tony").  *See* the accompanying Declaration of Frank

---

[2] *See* 11 U.S.C. § 704(a).

3

Fiotos, who is the president of both Movants, at paragraph 3 (hereafter, "Frank Dec., para __").

9.    For over four decades, until 2013 when the Fiotos Brothers sold the Diner Business to the Debtor, the Diner had been in the Brothers' ownership as a family business, acquired by John and Tony in 1973. John and Tony emigrated to the United States in the 1960s and began working in diners as dishwashers and cooks to save enough money to first rent and eventually buy the Diner Business. Frank joined them from Greece shortly thereafter, at which time the Brothers became equal partners and all worked in the Diner Business. *See* Frank Dec, para 4.

10.    The Diner Business had provided for the Brothers' and their families' livelihood for almost their entire working careers, surviving many setbacks, including a fuel truck crashing into the Diner in 1993 and destroying it in an ensuing explosion. The Brothers rebuilt and expanded it. In 2008, the Brothers undertook a major renovation of the Diner. After many years of successfully running the Diner, and with retirement age fast approaching and Tony's health beginning to fail, the Brothers decided to sell the business and use the proceeds to provide for them and their families in their retirement years. *See* Frank Dec., para 5.

11.    The Debtor bought the business on September 19, 2013 and entered into a Net Lease (defined above as the Lease) of that same date. *See* Frank Dec., para 6, Exhibit "1." The Lease was for a term of 30 years, ending September 30, 2043. Pursuant to a rent schedule attached to the Lease, the rent increased annually with the current annual rent being $258,421.20, payable in monthly installments of $21,535.10. *Id*. Among other things, the Lease also provided that the Debtor would be responsible for real estate taxes any of Landlord's legal fees incurred by reason of a default or in connection with any proceedings to recover the Premises. *Id*. Ex. "1" at pages 2-3, 24.

12.     While the Brothers operated the Diner over four decades, they shared the earnings more often by family need than equally.  This devotion continued after the sale and to this day with respect to Tony's and John's widows who cannot make ends meet without help from Frank, which help became more necessary due to the Debtor's failure to make any payments under the Lease between June 2020 and October 2021.  *See* Frank Dec., para 7.[3] The Brothers and their families have been denied pre-petition rental installments totaling $331,266.23.  [See Claim Dkt. No. 7-1.][4]  The Debtor failed to pay this pre-petition rent notwithstanding having received PPP and Restaurant Revitalization Funds of over one million dollars in early 2020 to mid-2021, together with other funds the Debtor has, all of which can be paid to creditors by a trustee.[5]  *See* Frank Dec., para 7.

13.     The Debtor filed a small business chapter 11 on the Petition Date (*i.e.*, August 28, 2021), listing cash assets of $547,852, derived at least in major part from the over $1 million in pandemic related money and $1,000 for "desks, chair, bookshelf in office of restaurant" and a host of personal property items all of "unknown" value.  [Dkt. No 1, "Schedule A/B: Assets Real and Personal Property" at pages 1-6.]

14.     On the liabilities side of the equation, the Debtor listed 518 Metropolitan as its only secured creditor, in the amount of $1,372,722.80, secured by the Diner "chattel, fixtures, equipment," and unsecured creditors totaling $757,562.00, inclusive of $357,000 owed to the

[3] It was only after the undersigned counsel for the Landlord reminded Debtor's counsel of Debtor's statutory duty to pay post-petition rent did rent start to get paid again.  After the rejection of the Lease, the Landlord stopped accepting "rent" checks, having returned by certified mail the rent check for April, but Landlord intends to pursue its rights to payment for use and occupancy until the Premises are surrendered.

[4] Beginning in mid-2020, the Debtor also failed to make any payments to 518 Metropolitan further depriving the Brothers and their families of badly needed retirement income. [Claim Dkt. No. 8-1.]  The Debtor's failure to make these payments resulted in 518 Metropolitan obtaining a judgment against the Debtor on July 30, 2021 in the amount of $1,372,711.80, which appears to have precipitated this bankruptcy as a way to further delay payment to the Brothers and their families.

[5] According to the federal government's website, the Debtor received PPP funds of $462,834 in two tranches, one on or about April 29, 2020 of $206,600 and the other on or about February 6, 2021 of $256,234, *see* https://www.federalpay.org/paycheck-protection-program (type in Sid Boys Corp. and select New York), and $647,181 in Restaurant Revitalization Funds, *see* https://data.sba.gov/dataset/rrf-foia (under Data and Review, click on the first Excel Spreadsheet, download it, and scroll down to row 8252; or use the find function and search for Sid Boys).  The Debtor should be required to account for such funds as none or almost none was used to repay rent and other obligations to the Movants.

Landlord for rent and real estate taxes. [Dkt. No. 1, "Schedule D: Creditors Who Have Claims Secured by Property" at page 1, and "Schedules E/F: Creditors Who Have Unsecured Claims" at pages 1-2].

15. The Debtor failed to file an affidavit pursuant to Local Bankruptcy Rule 1007-4, notwithstanding a directive from the Court to do so. [Dkt. No. 3.] The Debtor also failed to file retention papers for a broker, special litigation counsel and its accountant, despite this Court's direction at the February 17, 2022 status conference. [Unnumbered Dkt. Entry of 2/17/22.]

16. The operating reports filed by the Debtor have consistently been late. For example, the operating report for December was filed February 16, 2022 instead of by January 20, 2022 and the operating report for January was filed on March 26, 2022 instead of by February 20, 2022. [Dkt. 40 and 41.] A review of the docket shows that all the operating reports have been filed between several months and a week late.

17. As discussed below, the first two operating reports for 2022 show a loss of approximately $25,000, but that does not take into account what the Debtor is accruing for bankruptcy counsel, special ligation counsel, an accountant, and of late some type of consultant. Nor does it take into account the accruing liability for the Landlord's legal fees as well as interest which is running on 518 Metropolitan's $1,372,711.80 judgment (9% under state law). While we do not know the exact figures for most of these accruing expenses, even if the Debtor were breaking even cash-wise from operations, the Debtor would be incurring substantial and continuing losses due to these non-cash items.

18. The Petition Date, and therefore the date of entry of an order for relief, was August 28, 2021. 210 days from that date was March 25, 2022, and thus that date was the deadline to assume or reject the Lease. The Debtor did not file a motion to extend that time period. The Landlord's counsel sent Debtor's counsel a letter via email on April 4, 2022,

demanding that the Debtor immediately surrender the Premises to the Landlord, which to date it has not done nor made arrangements to do so. The Landlord has returned the check delivered by the Debtor to it for April rent so as to preclude any arguments that Landlord has in any way waived the deadline.

**LEGAL ARGUMENT**

**POINT I**

**LANDLORD IS ENTITLED TO AN ORDER DIRECTING THE DEBTOR TO FULFILL ITS STATUTORY DUTY TO IMMEDIATELY SURRENDER THE DEBTOR'S PREMISES TO LANDLORD**

19.     As set forth below, the Lease has been rejected and its leasehold interest terminated, and, because the Debtor is failing to comply with its statutory obligation to immediately surrender the Premises, Landlord is entitled to an order directing immediate surrender.

20.     Section 365(d)(4)(A) of the Bankrupt Code states, "an unexpired lease of nonresidential property under which the debtor is the lessee shall be deemed rejected, and the trustee shall immediately surrender that nonresidential real property to the lessor, if the trustee does not assume or reject the unexpired lease by the earlier of -- (i) the date that is 210 days after the date of the order for relief;[6] or (ii) the date of the entry of an order confirming a plan." 11 U.S.C. § 365(d)(4)(A). The Bankruptcy Code states further that the court may extend that time upon motion made *prior to the expiration of the 210-day period* "for cause." 11 U.S.C. § 365(d)(4)(B)(i) (emphasis added).[7]

---

[6] This 210-day time period is the result of amendments made to Section 365(d)(4) pursuant to the Coronavirus Aid, Relief, and Economic security (CARES) Act which increased the previous 120-day period to assume or reject.

[7] The provisions of the Bankruptcy Rules permitting extensions of deadlines in the Bankruptcy Rules do not apply to statutory deadlines. "Numerous courts have determined that [Bankruptcy] Rule 9006(b) does not grant courts the power to extend the period to assume or reject a lease after the statutory time has run under § 365(d)(4)." *In re Scarborough-St. James Corp.*, 554 B.R. 714, 722-23 (D. Del. 2016) (Bankruptcy Court has no power to retroactively extend the deadline, affirming Bankruptcy Court's issuance of order directing debtor to surrender leased premises); *In re Southampton Yen Rest. Grp. LLC*, No. 09-138764 (MG), 2009 WL 3925563, at *3 (Bankr. S.D.N.Y. Nov. 16, 2009) (automatic termination of leases under §365(d)(4) is substantive and not procedural); *see also Magnolia Bluff Factory Shops Ltd. P'ship v, Federated Food Courts, Inc. (In re Federated*

21.     "[T]he purpose of Section 365(d)(4) is to protect lessors from delay and uncertainty by forcing the trustee or debtor-in-possession to act quickly to assume unexpired leases." *In re Eastman Kodak Co.*, 495 B.R. 618, 623 (Bankr. S.D.N.Y. 2013), citing *In re Michael H. Clement Corp.*, 446 B.R. 394, 402 (N.D. Cal. 2011).

22.     Judge Gropper in *Eastman Kodak* also referred to the legislative history of the 2005 amendments to section 365(d)(4) to highlight that such amendments were "designed to remove the bankruptcy judge's discretion to grant extensions of the time for the retail debtor to decide whether to assume or reject a lease after a maximum possible period." *Id.* Further, the "immediate surrender" aspect of section 365(d)(4)(A) is "to enable the lessors to once again rent the premises and to earn income from the demised premises." *In re Tri-Glied, Ltd.*, 179 B.R. 1014, 1019 (Bankr. E.D.N.Y. 1995).

23.     The statute is clear that due to the Debtor's failure to timely assume or reject the Lease, the Lease is deemed rejected and the Debtor must "immediately surrender" the Premises to the Landlord.  *See Magnolia Bluff Factory Shops Ltd. P'ship v, Federated Food Courts, Inc. (In re Federated Food Courts, Inc.)*, 222 B.R. 396, 397 (Bankr. N.D. Ga. 1998) ("[A] debtor's failure to file a timely motion to assume or motion to extend the time to assume or reject an unexpired lease of non-residential real property results in the automatic rejection of that lease as a matter of law."); *see also In re Southampton Yen Rest. Grp. LLC*, No. 09-138764 (MG), 2009 WL 3925563 at *3 (finding that debtor must immediately surrender property

---

*Food Courts, Inc.)*, 222 B.R. 396, 397 (Bankr. N.D. Ga. 1998) ("Bankruptcy Rule 9006(b) is a rule governing the enlargement of time periods prescribed in other Bankruptcy Rules or court orders. Bankruptcy Rule 9006(b) refers to deadlines set by 'these rules or by a notice given thereunder or by order of the court.' It does not refer to enlarging time periods prescribed by statute."); cited by *Asbestosis Claimants v. U.S. Lines Reorganization Trust (In re U.S. Lines, Inc.)*, 262 B.R. 223, 234 (S.D.N.Y. 2001) (noting Bankruptcy Rule 9006(b)(1) "allows extension of certain rule and order deadlines, but not statutory deadlines"); *In re Tubular Technologies, LLC*, 362 B.R. 243, 246 (Bankr. D. S.C. 2006) (rejecting debtor's excusable neglect argument to enlarge time for debtor to assume the lease noting the court was "not aware of any case … that applies an excusable neglect standard, which is primarily used for obtaining relief from a judgment, to extend what is essentially a statute of limitations preclusion" for debtors); *In re Damach, Inc.*, 235 B.R. 727, 731 (Bankr. D. Conn. 1999) (finding Bankruptcy Rule 9006(b) does not "permit[] a court to extend a time limitation set by Congress in a statute; [it] permit[s] modification only of time limitations imposed by other rules or by the court);  3 Collier on Bankruptcy ¶ 365.05[3(b)] (16th ed. 2022) ("It is now clear that any order extending the initial 210-day period must be entered before the expiration of the deadline.").

following debtor's failure to timely file a motion to extend the time to assume the lease which rendered the lease "rejected as a matter of law").

24.     Surrender here requires the Debtor to vacate the Premises in order that the Landlord may regain possession of the Premises.  *See, e.g., In re MDC Sys., Inc.* 488 B.R. 74, 86 (Bankr. E.D. Pa. 2013) (surrender under the Bankruptcy Code is governed by federal law and "occurs when a tenant vacates and the landlord takes possession [of] the leased premises" and "debtor must physically surrender the leased property to the landlord"); *cf. In re Trujillo*, 485 B.R. 238, 249 (Bankr. D. Colo. 2012) ("Black's Law Dictionary defines 'surrender' as '[t]he act of yielding to another's power or control.").

25.     A Bankruptcy Judge has the authority to direct a debtor to surrender the property.  *See, e.g., In re The Deli Den, LLC*, 425 B.R. 725, 726 (Bankr. S.D. Fla. 2010) (ordering the debtor to surrender the leasehold); *In re Sok Jun Kong*, 162 B.R. 86, 98 (Bankr. E.D.N.Y. 1993) (Conrad Duberstein, B.J.) (same).

26.     In *Sok Jun Kong*, Judge Duberstein, after citing numerous cases in which courts ordered debtor lessees to immediately vacate premises where the leases were deemed rejected, quoted the Ninth Circuit in *In re Elm Inn, Inc.,* 942 F.2d, 630, 634 (9th Cir. 1991):

> As these courts have noted, the plain language and purpose of section 365(d)(4), the necessarily preemptive force of the Bankruptcy Code, and the broad equitable powers of bankruptcy judges all weigh in favor of granting a surrender order to a lessor who, under the terms of the provision, clearly deserves one.

*Id.* at 634 (citing 11 U.S.C. § 105(a)).  Based on this reasoning, Judge Duberstein granted the landlord an order directing the debtor to surrender the premises to the landlord within 10 days.  162 B.R. at 98.

27.     The case law was settled back then and continues to be well-settled that the Bankruptcy Court should enter an order requiring a recalcitrant debtor to surrender premises

subject to a rejected lease to the landlord. *See, e.g., In re Scarborough-St. James Corp.*, 554 B.R. 714, 718-19 (D. Del. 2016) (affirming Bankruptcy Court's issuance of order directing debtor to surrender premises to landlord); *In re U.S. Fax, Inc.*, 114 B.R. 70, 71 (E.D. Pa. 1990) (reversing Bankruptcy Court's denial of motion for an order directing the debtor to immediately surrender leased premises to landlord); *In re Tubular Technologies, LLC*, 362 B.R. 243, 247 (Bankr. D. S.C. 2006) (ordering debtor to immediately surrender leased premises to landlord); *In re Tri-Glied, Ltd.*, 179 B.R. at 1017, 1024 (issuing order directing the debtor to surrender possession of the premises, noting that the lessor was entitled to immediate possession under the statute); *In re Kong*, 162 B.R. at 97 ("bankruptcy court can issue an order granting the surrender of leased property to the lessor once the time for assumption or rejection of the unexpired lease has passed and the lease is deemed rejected.") (collecting cases); *In re Damianopoulos*, 93 B.R. 3, 8 (Bankr. N.D.N.Y. 1988) ("[T]his Court is also authorized under Code § 365(d)(4) to order the immediate surrender of the lease's non-residential real property to the lessor in the event of rejection, without resorting to state law."); *380 Yorktown Food Corp. v. 380 Downing Drive, LLC*, No. 55188/11, 2012 WL 2360897, at *13 n. 25 (Sup. Ct. Westchester County Mar. 9, 2012) ("When the only issue is the rights of the landlord as against the debtor tenants, courts have held that Section 365(d)(4) is self-effectuating such that the debtor must immediately surrender the premises (*i.e.*, that a warrant of surrender issue out of the bankruptcy court) rather than requiring that 'an order lifting the Code § 362 stay [be issued] so that state court eviction proceedings may continue.'").

28.     Under the statute and all applicable case law, this Court should order the Debtor to vacate the Premises forthwith.

**POINT II**

**CAUSE EXISTS TO CONVERT THE DEBTOR'S
CHAPTER 11 CASE TO ONE UNDER CHAPTER 7**

29.    As set forth herein, more than sufficient cause exists for this Court also to convert this case from chapter 11 to chapter 7.[8]

30.    Section 11l2(b) of the Bankruptcy Code requires that upon the motion of a party in interest, "the court shall convert a case under this chapter to a case under chapter 7 of this title ... if the movant establishes cause." 11 U.S.C. §1112(b)(1) (emphasis supplied). Prior to 2005, section 1112(b)(l) read, in pertinent part, that "the court <u>may</u> convert a case ..." (emphasis supplied).  In 2005, the section was amended, and the word "may" was replaced with the word "shall."  Given the statute's purposeful use of the word "shall," once a court finds cause, as it should here, conversion is mandatory.

31.    Section 1112(b)(4) describes a variety of non-exclusive factors which may constitute "cause" for the mandatory conversion of a chapter 11 case to a chapter 7 case, expressly including "inability to effectuate substantial consummation of a confirmed plan," "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," and "failure to comply with an order of the court."  *See* 11 U.S.C. § 1112(b)(4)(A), (E) and (M).  In addition to these express provisions, courts are free to consider other factors.  *C-TC 9th Ave. P'ship.* v. *Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1311 (2d Cir. 1997) ("It is important to note that this list is illustrative, not exhaustive."); *In re BH S&B Holdings, LLC*, 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010).

32.    The glaring and most obvious cause requiring conversion is that the Debtor has no lease to assume or assume and assign, rendering it impossible to continue operating and therefore to confirm a plan.  But other cause exists too, including (a) substantial and

---

[8] As set forth below in Section D., while cause also exists to dismiss the case, creditors would be better off with a trustee distributing the approximately $500,000 that the Debtor is sitting on as well as liquidate and distribute the proceeds of any other remaining assets to creditors.

continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation, and (b) the Debtor's failures to follow a directive of the Court as well as various requirements of the Bankruptcy Code.

A.      **Inability to Effectuate a Plan**

33.      It is simply impossible for the Debtor to confirm a plan due to the rejection of the Lease.  Such a complete inability to effectuate a plan is cause for conversion.  *See In re Johnston,* 149 B.R. 158, 162 (9th Cir. BAP 1992) (affirming Bankruptcy Court's conversion of less than four-month-old case based upon the debtor's inability to effectuate a plan); *In re Adbrite Corp.*, 290 B.R. 209, 219-21 (Bankr. S.D.N.Y. 2003) (converting case where debtor's only asset was subject to foreclosure and the debtor could not confirm a plan).

34.      It seems almost axiomatic that where it would be futile for a debtor to confirm a plan, such as when it loses its operating premises for any reason, such as a foreclosure or fire or, like here, rejection of a lease with the requirement for immediate surrender, a debtor's case should be converted to chapter 7.  It is no surprise therefore, that the courts have not hesitated to do so.  For example, in *Tirey Distributing Co. v. Sloan (In re Tirey Distributing Co.)*, 242 B.R. 717, 723 (Bankr. E.D. Okla. 1999), the court found that "cause" under section 1112(b) of the Bankruptcy Code existed to convert a chapter 11 case to one under chapter 7 where the creditor had been granted relief from the stay to foreclose on the debtor's business property, observing: "the Debtor in this case will be unable to effectuate a plan. Relief from the stay has been granted to Sloan to foreclose on all of their collateral."  *See also Roma Grp., Inc. v. Office of U.S. Tr. (In re Roma Grp., Inc.)*, 165 B.R. 779, 780 (S.D.N.Y. 1994) (finding sufficient cause existed to convert chapter 11 cases for liquidation under chapter 7 where debtor no longer had property on which to operate its business; court also noted the debtor's failure to comply with necessary requirements to proceed under chapter 11); *In re FRGR Managing Member LLC*, 419 B.R. 576, 581 (Bankr. S.D.N.Y. 2009) (granting motion to

convert case to chapter 7 where the debtor's "sole asset … has been foreclosed upon"); *In re D & F Meat Corp.*, 68 B.R. 39, 40-41 (Bankr. S.D.N.Y. 1986) (converting case to chapter 7 finding following a fire that destroyed debtor's business: "[T]he absence of any business or other assets will not support the continuance of this case in a Chapter 11 reorganization mode.").

35.     Like in these cases, without its Lease, there is nothing to support continuance of this case in chapter 11 and the case should be converted.

**B.     Substantial or Continuing Losses and Inability to Rehabilitate the Business.**

36.     Both prongs of this type of cause are satisfied here because:

    a.  the estate continues to lose substantial amounts each month; and

    b.  the Debtor has not presented any plan of rehabilitation, and with rejection of the Lease, rehabilitation is impossible.

**1.     Substantial and Continuing Losses to or Diminution of the Estate**

37.     This case should be converted to one under chapter 7 of the Bankruptcy Code because there has been, and continues to be, substantial loss to or diminution of the estate. Bankruptcy courts have consistently held that negative cash flow alone is sufficient to establish "continuing loss to or diminution of the estate."  *See*, *e.g.*, *In re 3868-70 White Plains Road, Inc.,* 28 B.R. 515,518 (Bankr. S.D.N.Y. 1983) (continuing loss or diminution illustrated by debtor's continual negative cash flow); *In re Halal 4 U LLC,* 2010 Bankr. LEXIS 33335 (Bankr. S.D.N.Y. 2010) (converting case to chapter 7 due, in part, to the estate's negative cash flow and inability to meet basic operating expenses); *see also 7 Collier on Bankruptcy* 112.04[5][a][i] (Alan N. Resnik & Henry Sommers, eds. 15th ed. 2004) ("If ... the debtor is operating with a sustained negative cash flow ... this fact is sufficient to support a finding that the debtor is experiencing a 'continuing loss to ... the estate'").

38.     Here the operating reports show that the debtor lost $24,625 over the first two months of this year [Dkt. No. 43 shows a loss of $29,369 and Dkt. No. 41-1 shows a gain of $4,744].  But nothing in the Debtor's operating reports takes into account, or reports, bankruptcy expenses accruing since the Petition Date and which continue to accrue for Debtor's bankruptcy counsel and special litigation counsel and for its accountant.  Nor would they show amounts accruing for Landlord's legal fees reimbursable under the Lease terms or for the interest accruing on 518 Metropolitan's $1,372,711.80 judgment.  Without including amounts accruing for the Debtor's professionals in its operating reports, the Court should presume that the Debtor is operating at an even much greater loss.  *See In re AdBrite Corp.,* 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003) ("To determine whether there is a continuing loss to or diminution of the estate a court must make a full evaluation of the present condition of the estate, not merely look at the debtor's financial statements.").

39.     This deterioration of the Debtor's assets from operating expenses and ongoing administrative expenses, as well as Landlord legal fees and 518 Metropolitan judgment interest constitutes "diminution" within the meaning of Section 1112(b)(4)(A). *See In re Herb Philipson's Army*, No. 18-61376 (DD), 2019 WL 11031654, at *6 (Bankr. N.D.N.Y. Dec. 19, 2019) (finding indisputable substantial and continuing losses to and diminution of estate due to debtor's inability to pay administrative expenses associated with winding down its affairs, completed liquidation, and store closing); *In re Vaughan Co., Realtors*, No. 11-10-10759, 2013 WL 2244285, at *6 (Bankr. D. N.M. May 21, 2013) ("Where a debtor has stopped operating its business, a continuing diminution can occur based on the accumulation of administrative expenses without a reasonable prospect of payment."); *In re Brutsche*, 476 B.R. 298, 305 (Bankr. D. N.M. 2012) ("[P]rofessional services come at a cost, obviously, which cost needs to be factored in the calculation of gains and losses for the estate. And the

hard fact is that these costs are rapidly mounting expenses for the estate that help put the estate in the position of continuing substantial losses.").

40.     Further, even if the Debtor asserts that any losses to the estate are minimal or otherwise insignificant to find cause for conversion under section 1112(b)(4)(A), this Court has held that losses to the estate need not necessarily be large. Rather "[a]ll that need be found is that the estate is suffering some diminution in value." *In re Taub*, 427 B.R. 208, 231 (Bankr. E.D.N.Y. 2010). There is no question that the Debtor here is suffering some, if not a substantial, diminution in value.

41.     Thus, the first requirement of mandatory conversion to chapter 7 of the Bankruptcy Code is met here.

**2.   There Is No Reasonable Likelihood That the Debtor Will Be Rehabilitated**

42.     With respect to the second prong of section 1112(b)(4)(A), the Debtor cannot dispute that it has any reasonable likelihood that it can rehabilitate its business in view of the deemed rejection of the Lease.

43.     There is simply no way that the Debtor could confirm a plan without assuming the Lease.  The Lease has been rejected, rendering a rehabilitation of the Debtor impossible. "Rehabilitation means to put back in good condition and reestablish on a sound basis." *In re Adbrite,* 290 B.R. 209, 216 (Bankr. S.D.N.Y. 2003).  It requires "that the debtor will be reestablished on a secured financial basis, which implies establishing a cash flow from which its current obligations can be met." *Id*.  Without the Lease, the Debtor has no way to do any of these things.  *See also In re Tianna Queen Motel, Inc.,* 749 F.2d 146 (2d Cir. 1984) (affirming Bankruptcy Court's order of conversion in the absence of a viable plan).

44.     "Where there is no reasonable possibility of an effective reorganization, the bankruptcy court is not compelled to wait a certain period of time, to the detriment of creditors, before ordering conversion of the case." *Johnston v. Jem Dev. Co. On re*

*Johnston),* 149 B.R. 158, 162 (9th Cir. B.A.P. 1992) (affirming Bankruptcy Court's conversion order issued less than 4 months into the case). As the Fourth Circuit Court of Appeals concluded, "[i]t is of course obvious that 'if there is not a potentially viable business in place worth protection and rehabilitation, the Chapter 11 effort has lost its raison d'etre ...' and the ability of bankruptcy courts to inquire into that critical matter at the very threshold would seem indispensable to proper accomplishment of the basic purposes of Chapter 11 protection." *Carolin Corp. v. Miller*, 886 F.2d 693, 698 (4th Cir. 1989) (internal citations omitted). Here, the Debtor cannot stay in business without a lease for the Premises.

45. Accordingly, both in view of substantial or continuing losses and lack of any reasonable likelihood of rehabilitation, this case should be converted from a chapter 11 case to a case under chapter 7 without delay to enable a trustee to expeditiously liquidate the Debtor's remaining assets and distribute the proceeds to creditors.

**C.     The Debtor Has Failed To Comply With Orders of the Court
       and Requirements of the Bankruptcy Code and Rules**

46. Maintaining a chapter 11 case is a privilege and not a right, and that privilege is conditioned on compliance with directives of the Court and requirements of the Bankruptcy Code and Bankruptcy Rules.  While there have been cases with more egregious shortcomings in this regard, there have been shortcomings nevertheless that establish cause, thus requiring conversion to chapter 7.

47. As the District Court in *Roma* observed: "Where debtors fail to perform their obligations, they may not use Chapter 11 'to prolong control of an insolvent enterprise where no benefit to the public or creditors is plausible."  165 B.R. at 780 (affirming conversion due in part to failure to file monthly operating reports); *see also In re Sillerman*, 605 B.R. 631, 657 (Bankr. S.D.N.Y. 2019) (finding sufficient evidence to warrant conversion where the debtor failed to comply with court orders, make timely disclosures required by the Bankruptcy Code and Rules, and file tax returns due post-petition); *In re Babayoff*, 445 B.R.

64, 80 (Bankr. E.D.N.Y. 2011) (finding cause existed for conversion or dismissal where the debtor failed to comply with court orders and did not submit all monthly operating reports as required and those that were filed were late). And, of course, the statute is explicit about cause including a debtor's failure to comply with an order of the court. 11 U.S.C. § 1112 (b)(4)(E); *see also In re Babayoff*, 445 B.R. at 80 ("This Section gives effect to the notion that compliance with court orders is a fundamental obligation of any party, and a debtor's failure to comply with a court order is a troubling matter indeed.").

48.     In the approximate eight months since the Petition Date, the Debtor has essentially done nothing to move the case along, other than retain bankruptcy counsel and obtain an order setting a bar date for claims. The Debtor's failure to comply with court orders and the Bankruptcy Code and Rules began as early as the Petition Date. This Court entered a *Notice of Deficient Filing* [Dkt. No. 3] on August 28, 2021 directing the Debtor to file the Affidavit Pursuant to EDNY LBR 1007-4, which to date the Debtor has failed to file.

49.     Furthermore, while during the first six or so months of this case, the Debtor indicated to the Court, the U.S. Trustee and Movants that it was going to retain a broker to sell its business, the Debtor failed to file a motion to retain the broker, even after the Court directed—at the February 17, 2022 status conference -- that the Debtor file those retention papers as well as retention papers for special litigation counsel and its accountant by March 10, 2022. It is now a month after that deadline and the Debtor has utterly failed to do so. [Unnumbered docket entry dated 2/17/22 states "Debtor to file broker, accountant and special counsel retention by 3/10/22."]

50.     At the most recent status conference, held on March 24, 2022, the Debtor's counsel indicated to the Court that the Debtor's principal, who admittedly has little to no experience operating a diner, was going to market the Diner after an unretained "consultant friend" was going to help her. With respect to the two other sets of retention papers, Debtor's

counsel said she was awaiting comments from the U.S. Trustee, which does not excuse the Debtor's failure to get them to the U.S. Trustee for over six months. In addition, virtually each and every one of the Debtor's operating reports were filed late, some by months. Finally, the Debtor is refusing to comply with the clear directive of Bankruptcy Code section 365(d)(4)(A) to surrender the Premises.

51.     Based on this Debtor's history in chapter 11, Movants have no faith in this Debtor ever being able to move this case forward in any constructive way. Due to the Debtor's history of non-compliance, the Court should find further and independent cause to convert the case to chapter 7. *See Roma*, 165 B.R. at 780 ("The failure to file monthly operating statements as required by the Local Rules of the Bankruptcy Court and the United States Trustee Guidelines, whether based on inability to do so or otherwise, undermines the Chapter 11 process and constitutes cause for dismissal or conversion of the Chapter 11 proceedings.").

**D.      Conversion Rather Than Dismissal Is in the Best Interests of Creditors Because All Remaining Estate Functions Can and Should Be Performed by a Trustee**

52.     Once cause is established, the Court must determine whether dismissal or conversion of the case is "in the best interest of the creditors and the estate." *See In re Superior Siding & Window, Inc.*, 14 F.3d 240, 242 (4th Cir. 1994) ("A motion filed under this section invokes a two-step analysis, first to determine whether cause exists either to dismiss or to convert the Chapter 11 proceeding to a Chapter 7 proceeding, and second to determine which option is in the best interest of creditors and the estate.") (*citing In re Mechanical Maintenance, Inc.*, 128 B.R. 382, 386 (E.D. Pa. 1991)) (internal quotation marks omitted); *see also In re BHS&B Holdings LLC*, 439 B.R. 342, 351 (Bankr. S.D.N.Y. 2010) ("It is within the court's discretion to convert or dismiss a chapter 11 case, provided the best interests of creditors and the estate are served.") (internal citation omitted).

53.     Courts apply a "facts and circumstances" test in determining whether dismissal or conversion is in "the best interests of creditors and the estate." Among the factors (the "Factors") that courts consider in making that determination are:

(1)     Whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal.

(2)     Whether there would be a loss of rights granted in the case if it were dismissed rather than converted.

(3)     Whether the debtor would simply file a further case upon dismissal.

(4)     The ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors.

(5)     In assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise.

(6)     Whether any remaining issues would be better resolved outside the bankruptcy forum.

(7)     Whether the estate consists of a "single asset."

(8)     Whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests.

(9)     Whether a plan has been confirmed and whether any property remains in the estate to be administered.

(10)    Whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns.

*See* Collier on Bankruptcy 1112.04[7] at 46-48 (Richard Levin & Henry J. Sommers eds., 16th ed. 2018). *See, e.g., In re BHS&B Holdings. LLC,* 439 B.R. at 346 (citing the aforementioned Factors); *In re FRGR Managing Member LLC,* 419 B.R. 576, 580-81 (Bankr. S.D.N.Y. 2009) (same).

54.     For the reasons set forth below, the Court should find that in applying the Factors, it is in the best interests of the creditors and the estate that the Debtor's chapter 11 case be converted to one under chapter 7 of the Bankruptcy Code rather than be dismissed.

55.     On the first Factor, which relates to whether any creditors received preferential payments, the Debtor's Statement of Financial Affairs neither checks the box for none nor lists any transfers.  It is hard to believe that the Debtor did not make dozens of payments to vendors and others within the 90 days before the Petition Date.  [Dkt. No. 1, "Statement of Financial Affairs for Non-Individuals Filing Bankruptcy" at page 1, question 3.]  The Debtor checked the box for none for payments to insiders within one year of the bankruptcy, which is similarly hard to fathom given that the Debtor's principal works at the Diner.  [Dkt. No. 1, "Statement of Financial Affairs for Non-Individuals Filing Bankruptcy" at page 2, question 4.]

56.     The Movants are unaware of whether dismissal would result in loss of rights of any creditors.  As to the deemed rejection of the Lease, the case law is clear that dismissal would have no effect, and even if this Court were to dismiss the case before compelling surrender, the case law is clear that the Debtor's rights in the Lease are gone by virtue of Federal Law and the Supremacy Clause of the Constitution.  *See, e.g., In re Tri-Glied, Ltd.,* 179 B.R. 1014, 1019 (Bankr. E.D.N.Y. 1995) (requirement of surrender results in the irrevocable termination of the debtor's rights in the lease); *In re BSL Operating Corp*., 57 B.R. 945, 947 and 952 (Bankr. S.D.N.Y. 1986) (lease deemed rejected with requirement for immediate surrender results in the legal expiration of the landlord-tenant relationship, which cannot be revived by dismissal; to rule otherwise would "utterly defeat the intent of section 365(d)(4)"); *cf. In re Strick Chex Newnan One, LLC,* 2016 WL 3135749 (Bankr. N. D. GA. 2016) (conversion of case does not revive lease deemed rejected and required to be surrendered).

57.     While the Movants do not know whether the Debtor would simply file a further case upon dismissal (Factor 3), it is hard to understand how the Debtor would be able to keep creditors at bay and therefore it is likely the Debtor would either file another case or

have an involuntary filed against it by creditors seeking to receive their pro rata portion of the Debtor's substantial cash before it dissipates.

58.    Factor 4 weighs heavily in favor of conversion, as there are over $500,000 in unencumbered funds, mostly from the PPP and Restaurant Revitalization grants, to repay creditors. The Court and creditors should be concerned as to what would happen to those funds upon dismissal, and a trustee should be appointed to distribute them according to the priorities of the Bankruptcy Code.

59.    Factor 5 – 7 are either not applicable or weigh in favor of conversion.

60.    Factor 8, about whether the Debtor has engaged in misconduct that should be investigated by a chapter 7 trustee, weighs in favor of conversion. As noted above, the Debtor received over $1.1 million in COVID pandemic related aid, expressly permitted to be used for rent and debt service, but the Debtor did neither with such funds, and the Debtor should be required to account to a trustee for where those funds went. As also noted above, the Debtor's statement of financial affairs appears to be incomplete about preference payments, including those to insiders, and the Debtor has been utilizing professionals without Court supervision, including the latest in the form of a consultant brought up at the last status conference.

61.    Factor 9 regarding a confirmed plan is not applicable.

62.    Finally, Factor 10 about whether the appointment of a trustee to supervise environmental concerns is not applicable.

63.     Everything that remains to be done by or on behalf of the estate, such as the liquidation of the Debtor's remaining assets, claim resolution, and investigation and prosecution of any estate causes of action, can and should be done by an independent third-party trustee, in accordance with chapter 7 of the Bankruptcy Code. Therefore, because a

chapter 7 trustee is statutorily empowered and required to perform all the estate's remaining

functions, this case should be converted to chapter 7.

## **CONCLUSION**

WHEREFORE, Landlord respectfully submits that, for the reasons set forth herein,

the Court should enter an order directing the Debtor to immediately surrender the Premises to

Landlord and both Movants respectfully submit that the Court should enter an order

converting the case to one under Chapter 7.

Dated: Garden City, New York
   April 11, 2022

      CULLEN AND DYKMAN LLP


      By: /s/ *Thomas R. Slome*
        Thomas R. Slome
        Amanda A. Tersigni
      100 Quentin Roosevelt Boulevard
      Garden City, New York 11530
      (516) 357-3700

      *Counsel for 514 Fioto Property Corp.*
      *and 518 Metropolitan Avenue Corp.*