CULLEN & DYKMAN LLP
Thomas R. Slome
100 Quentin Roosevelt Boulevard
Garden City, NY 11530
(516) 357-3700
tslome@cullenllp.com

*Counsel for 514 Fioto Property Corp.*
*and 518 Metropolitan Avenue Corp.*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
In re:

SID BOYS CORP. d/b/a KELLOGG'S DINER,

                Debtor.
-----------------------------------------------------------------X

Chapter 11
Case No.: 21-42207-ess

**REPLY MEMORANDUM OF LAW TO DEBTOR'S OBJECTIONS TO MOTION OF 514 FIOTO PROPERTY CORP. AND 518 METROPOLITAN AVENUE CORP. FOR AN ORDER (I) DIRECTING DEBTOR TO IMMEDIATELY SURRENDER PREMISES DUE TO DEEMED REJECTION OF NON-RESIDENTIAL REAL PROPERTY LEASE AND (II) CONVERTING THE DEBTOR'S CHAPTER 11 CASE TO A CASE UNDER CHAPTER 7, AND IN OPPOSITION TO DEBTOR'S CROSS-MOTION FOR DETERMINATION THAT THE DEBTOR'S TIME TO ASSUME OR REJECT LEASE IS GOVERNED BY 11 U.S.C. § 365(d)(2) INSTEAD OF 11 U.S.C. §362(d)(4)**

Movants[1] by and through their undersigned counsel, respectfully submit this reply memorandum ("Reply Memo") to the Debtor's objections ("Objections") [Dkt. No. 46] to the Motion of 514 Fioto Property Corp. for an Order (I) Directing Debtor to Immediately Surrender Premises Due to Deemed Rejection of Non-Residential Real Property Lease and (II) Converting the Debtor's Chapter 11 Case to a Case under Chapter 7 (the "Motion") [Dkt. No. 44]. This Reply Memo also addresses the Debtor's request in the Objections, styled as a cross-motion, for an order determining that the Lease need not be assumed or rejected by the 210-day deadline set forth in 11 U.S.C. § 365(d)(4), which specifically governs the time to assume or reject non-residential real

---

[1] Capitalized terms not defined in the Reply Memo have the meanings ascribed to them in the Motion.

property leases, but instead that the Lease may be assumed or rejected any time before the plan confirmation deadline set forth in 11 U.S.C. § 365(d)(2) governing all other executory contracts. In further support of the Motion and in reply to and in opposition to the Objections (including cross-motion), Movants respectfully state as follows:

## **PRELIMINARY STATEMENT**

1. The Movants agree with the Debtor that there are no facts that need to be resolved for the Court to decide one of the major issues in the Motion, which is whether the Lease has been rejected by operation of law. The disagreement on that issue is a legal one. Movants submit that the Debtor's argument is premised on a mischaracterization of the executory nature of a promissory note and misplaced reliance on some sparse, questionable, and distinguishable case law.

2. Debtor's only argument relies on its unsupported assertion that a promissory note it gave in exchange for the Diner Business (and one that has been merged into the Judgment) is an executory contract.[2] With that erroneous premise, the Debtor then mistakenly relies on two bankruptcy court decisions holding that where the parties entered into two <u>executory contracts</u>, one being a lease and the other being an ongoing, comprehensive and valuable franchise contract, the deadline to assume or reject both should be confirmation.[3] As one circuit court observed, while it is not clear if these two bankruptcy court decisions were correct, their holdings <u>might</u> be supportable in the context of a franchise agreement clearly being the "dominant" executory contract,

---

[2] The Debtor states, contrary to the law, that the "Promissory Note for the purchase of the business has a fifteen (15) year term, beginning on October 1, 2013 and ending on September 30, 2028 <u>and is thus an executory contract</u>." *See* Objections at ¶ 8 (emphasis added). The law on promissory notes not being executory contracts is set forth below.

[3] The two cases are *In re Harrison*, 117 B. R. 570 (Bankr. C.D. Cal. 1990) and *In re FPSDA I, LLC*, 450 B.R. 392 (Bankr. E.D. N.Y. 2011), which relied on *Harrison*. Both are readily distinguishable as discussed in detail below.

thereby justifying a stay pending appeal to determine whether the longer deadline applicable to that contract applies to a related lease as well.[4]

3. This case, however, does not involve a second executory contract, let alone a comprehensive and dominant one. The promissory note constituting the balance of the purchase price for the Diner Business (the "Promissory Note"), cannot be assumed or rejected (indeed, it was reduced to and merged into the Judgment), and in any event the Lease is by far the dominant agreement here, including with respect to ongoing contractual obligations of both parties, length of term, and dollar amounts to be paid.

4. Thus, the two bankruptcy court cases, to the extent they are correct under their facts, are completely inapposite. And the one circuit court decision citing them in the context of a motion seeking a stay pending appeal further supports the Landlord's position that in the circumstances here, where the main and only executory contract is the Lease—and there is no dominant executory contract, the deadline in the Bankruptcy Code for a debtor to assume or reject a lease applies.

5. While the facts here are completely distinguishable from those in the two cases, and while the circuit court observed the holdings were questionable even in the context of a dominant franchise executory contract, Movants submit that the cases were wrongly decided in any event in that they are contrary to the plain language of the Bankruptcy Code. Applying equitable principals to avoid the plain language would lead to anomalous results. For instance, if a lease is not subject to the deadline for assumption/rejection because it was entered into in connection with other executory contracts, is the cap on damages for the rejection of a lease under section 502(b)(6) inapplicable as well? Supreme Court jurisprudence is clear that a court should not apply notions of equity to rewrite the Bankruptcy Code, which should only be done by

---

[4] *In re A&F Enterprises, Inc. II*, 742 F.3d 763, 767 (7th Cir. 2014) (finding the real property lease was the "tail wagging the dog").

Congress while considering the effect any such amendments would have on the entire statutory scheme.[5]

6. The Debtor does not dispute that the Lease is a typical lease for non-residential real property. As such, all the Bankruptcy Code's provisions governing a lease should apply to it with equal force. If in certain circumstances—which are not even present here—it could present a practical problem for a particular debtor to have to decide whether to assume or reject by the statutory deadline including any available extensions, that is a problem that the legislature should address. But the deadline does not even present such a problem here, because the Debtor's predicament was one of its own doings and has nothing to do with the Lease's relationship to a second, dominant, executory contract. The Debtor could have had 300 days to decide, which is the same deadline for this small business debtor to file a confirmable plan, but it failed to act.

7. In any event, the equities—to the extent they are relevant—support the Landlord's position. As mentioned, the Debtor could have made a motion to extend the time to assume or reject the Lease to coincide with its June 23, 2022 plan deadline (*i.e.,* 300 days),[6] or even made the decision whether to assume or reject the Lease by the 210-day deadline. Glaringly absent from the Objections is any explanation as to why the

---

[5] Despite the discretionary powers bankruptcy judges are given by virtue of section 105, those equitable powers are limited "and can only be exercised within the confines of the Bankruptcy Code." *In re MF Glob. Inc.*, 506 B.R. 582, 597 (Bankr. S.D.N.Y. 2014). Such inherent power "does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code." *Law v. Siegel*, 571 U.S. 415, 421 (2014); *see also Smart World Techs., LLC v. June Online Servs. (In re Smart World Techs., LLC)*, 423 F.3d 166, 184 (2d Cir. 2005) (highlighting that even section 105(a)'s powers "should not be employed as a panacea for all ills confronted"); *In re Soussis*, 624 B.R. 559, 566 (Bankr. E.D.N.Y. 2020) (finding section 105 authority is not "unfettered"). Section 105 "does not 'authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity,'" *In re MF Glob. Inc.*, 506 B.R. at 597, or "contravene specific statuary provisions," *Smart World Techs., LLC*, 423 F.2d at 184; *see also In re Empire State Conglomerates, Inc.*, 546 B.R. 306, 318 (Bankr. S.D.N.Y. 2016) (rejecting trustee's argument that court could use its equitable powers to grant relief of removal because such relief did not fit within the confine of the relevant Bankruptcy Code provision); *In re New Breed Realty Enters., Inc.*, 278 B.R. 314, 318-19 (Bankr. E.D.N.Y. 2005) (finding court could not extend section 108(b) cure period using its section 105 powers especially where debtor failed to request extension of time before statutory period expired); *Geron v. Valeray Realty Co. (In re Hudson Transfer Grp., Inc.)*, 245 B.R. 456, 460 (Bankr. S.D.N.Y. 2000) (finding court could not use its powers under section 105(a) to extend debtor's cure period under section 108(b) which would otherwise countermand Congress' unambiguous intent of establishing the specific deadline).
[6] The Debtor states that its deadline is June 24, 2020 (Objections, ¶27), but by Movants' count it is the day

4

Debtor could not have sought an extension to 300 days or why it could not have made the decision by the 210-day deadline.

8.     Instead of spending the first seven months of the case marketing the Diner for a sale under a potentially confirmable plan—something Debtor represented it would do to the Court and the Movants on multiple occasions, the Debtor decided to either renege on those representations or undertake a sale process on its own timeline, and one contrary to this Court's express directive at the February 17, 2022 status conference, contrary to the deadline in Section 365(d)(4) and contrary to Congress' intent in making the streamlined process of a small debtor case available.[7]

9.     The Debtor's woes stem only from its dilatory approach to this case, an approach akin to the impetus for Congress' 2005 amendments to the Bankruptcy Code to include a firm 120-day deadline for assuming a lease of non-residential real property.[8] That deadline was made even longer—210 days—for this Debtor due to the Covid

---

before.

[7] Congress set the 300-day plan deadline in section 1121(e) because it intended small business debtor cases to move swiftly to conclusion, giving a small business debtor certain advantages but in exchange subjecting it to certain deadlines. *See In re Wheelchair Sales & Servs., Inc.*, 593 B.R. 321, 322 (Bankr. N.D. Ill. 2018). The BAPCPA amendments "justified these new burdens as necessary to correct the perceived lack of creditor oversight in small business Chapter 11 cases." *Id.*, citing H.R. Rep. No. 109-31, pt. 1 at 19 (2005); *see also In re Destileria Nacional, Inc.*, No. 20-01247 (ESL), 2021 WL 2549686, at *6 (Bankr. D. P.R. June 21, 2021) ("Congress provided a small business chapter 11 designation to reduce the time and expense required for small business debtors to find relief in a chapter 11 while requiring said debtor to move at an expedited pace."); *In re Shea, Ltd.*, 545 B.R. 529, 536 (Bankr. S.D. Tex. 2016) (same); *In re Sanchez*, 429 B.R. 393, 398 (Bankr. D. P.R. 2010) ("The expedited nature of the confirmation process pursuant to 11 U.S.C. § 1129(e) is a clear example of Congress' attempt to keep small business cases on a short leash.").

[8] The current time limits, subject to the temporary Covid-related extension applicable to this case, were part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-08, 119 Stat. 23 (2005). Specifically, BAPCPA amended section 364(d)(4) to increase the initial period in which the debtor must assume or reject from 60 to 120 days and restricted the court's power to extend such period to 90 days. *See In re Southampton Yen Rest. Grp. LLC*, No. 09-13874 (MG), 2009 WL 3925563, at *3 (Bankr. S.D.N.Y. Nov. 16, 2009) ("[S]ection 404 of the Act amends section 365(d)(4) of the Bankruptcy Code to establish a *firm, bright line deadline* by which an unexpired lease of nonresidential real property must be assumed or rejected. If such lease is not assumed or rejected by such deadline, then such lease shall be deemed rejected, and the trustee shall immediately surrender such property to the lessor."), citing H.R. Rep. No. 109-31, at 86 (2005) (emphasis added); *In re Simbaki, Ltd.*, 520 B.R. 241, 244 (Bankr. S.D. Tex. 2014) ("BAPCPA eliminated the potentially indefinite assumption period and set forth 'a maximum possible period of 210 days from the time of entry of the order of relief.'"), citing H.R. Rep. No. 109-34 at 86 (2005). Before the amendment, debtors were able to petition the court continuously for additional time: "[L]andlords were left in limbo as debtors often died a slow and inevitable death" because debtors were able to obtain repeated extensions. *See* American Bankruptcy Institute 28th Annual Spring Meeting, BAPCPA Rollback as a Cure for Unsuccessful Reorganizations? Not so Fast! (2009) (statement of Todd J. Zywicki, Professor, George Mason

pandemic. The Debtor should have taken advantage of this generosity but failed to do so, and now asks this Court to ignore the plain language of the Bankruptcy Code and Congressional intent, just to save it from its mistakes and lax attention to its responsibilities as a chapter 11 debtor.

10. The Movants have been prejudiced long enough by the Debtor's failures, starting in mid-2020 when the Debtor failed to make any further payments under the Lease or the Promissory Note, notwithstanding that it had sufficient funds on hand to come current under both. Instead, the Debtor dangled those funds in front of the Movants, offering to use the funds to make the payment <u>only if</u> the Movants agreed to substantially reduce their legal entitlement to monies their principals and/or their widows could not afford to give up.

11. 518 Metropolitan patiently waited nearly a year after the last payment on the Promissory Note before it had enough and brought suit (on April 28, 2021), giving the Debtor every chance to come current, which it could have done from the government assistance funds it was holding, or to negotiate in good faith for a settlement without holding hostage the assistance funds given to the Debtor to pay rent and debt service.[9] In the Objections, the Debtor mischaracterizes the Movants' rejection of such attempts as stubbornness—it was anything but. The reality is that the Debtor forced Movants to the point where they had to assert their well-founded legal rights, as demonstrated by the State Court's almost immediate award of summary judgment on the Promissory Note in the face of specious arguments the Debtor made in response. The waiting game failed the Debtor pre-petition, and its new post-petition waiting game should fail as well.

---

School of Law.
[9] While the Debtor represents in the Objections, ¶ 12 that it used 40% of the PPP money to pay arrears to the Movant, what the Debtor fails to state is that the amount was only $82,640, which was 40% of the first round of PPP funds totaling $206,600 received in April 2020. Thus, the Debtor used less than 10% of its $1,110,015 government assistance, let the arrears accrue for nearly a year, made a calculated choice to allow a judgment to be entered against it and force it to file bankruptcy. *See* Motion, ¶ 12 and footnotes 4-5. The Movants also would point out that when the Debtor was seeking concessions, it did so without revealing to Movants that it had

12. Further, the Debtor's delay is prejudicing all creditors. As the Debtor admits, it is holding approximately $676,000 of assistance funds, much of which it obtained as far back as April 2020—over two years ago. The Debtor did not use such funds to pay Movants or its other creditors for quite some time now. The Debtor has scheduled claims in addition to those of the Movants, which total approximately $400,000, with more claims asserted as shown in the claims register. Upon conversion of this case, a trustee can liquidate the Debtor's assets and distribute the proceeds and the cash that the Debtor has been sitting on for so long and do so for all creditors (including Landlord subject to the cap, unless the Lease is not really a lease). A trustee can also look into non-insider preferences (which the Debtor failed to list) and insider transfers for which the Debtor quite surprisingly scheduled as "none." *See* Motion ¶ 55.

13. For all these reasons, including the plain language of the Bankruptcy Code and the best interests of the creditors of this estate, the Court should find that the Lease was rejected as a matter of law and order the Debtor to surrender the Premises forthwith. And for the reasons set forth in the Motion and herein, including that (a) the Debtor can no longer sell the Diner, (b) the Debtor has failed to show it is not losing money through accruals of administrative expenses, interest on the Judgment and Landlord legal fees, and (c) the Debtor has failed to comply with many of its obligations as a chapter 11 debtor, the Court should convert this case to chapter 7.

## **UNDISPUTED FACTS**

14. The facts that matter to resolve the Motion and Objections are not in dispute. The Debtor does not dispute that the 210 days under Section 365(d)(4) ran without the Debtor assuming or rejecting the Lease or filing a motion to extend that time for cause. Rather, the Debtor raises a host of irrelevant and false accusations, attempting to impugn the Movants' principals by misrepresenting the pre-petition facts, including settlement discussions, and

---

receive the $647,181 in the Restaurant Revitalization Funds.

maligning the Movants' attempts to enforce their right to payments both under the Lease and the Promissory Note, after affording the Debtor substantial time to use its PPP funds and Restaurant Revitalization funds to come current in rent and/or debt service before being forced to sue.[10]

15. The Debtor also does not dispute that it has failed in many ways to comply with Court directives and the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules. In the Objections, the Debtor did not respond to, and chose to simply ignore the following: (a) its failures to follow two Court directives, one to comply with the requirement of the Local Bankruptcy Rules to file a LBR 1007-4 affidavit and the second to file retention applications for professionals by the Court's specific deadline; (b) the requirement to file—on a timely basis—operating reports (and even relying in its Objections on an unfiled and late operating report it says it intends to file for March); and (c) the requirement to use professionals—professionals it has been using for nearly eight months—only with appropriate and timely court approval.

16. Finally, relating to losses to the estate, the Debtor does not respond to the Movants' common-sense observations that accruing expenses of administration are to be considered, simply ignoring these expenses instead of providing the Court with the amount of such administrative expenses and an idea of their rate of accrual.

## ARGUMENT

**A. The Lease Should Be Deemed Rejected and the Debtor Required to Surrender the Premises Immediately**

17. The Debtor admits that if the 210 days applied to the Lease, the Lease is rejected and the Landlord is entitled to an order compelling the Debtor to immediately

---

[10] Although not relevant to this Motion, Movants take issue with many of the factual assertions in the Objections, many of which are simply statements of counsel or hearsay. If any of the Debtor's factual assertions mattered for the relief sought in the Motion, the Movants would dispute most of them as false. For example, the Movants could demonstrate that the Debtor had sufficient funds to keep the Lease and Promissory Note current, and thus could have avoided this entire bankruptcy, but dangled those funds in front of the Movants to try to get overreaching concessions for the benefit of the Debtor's principal, including an approximate 75% forgiveness of

8

surrender the Premises to the Landlord. The statutory language plainly states the foregoing, and the Debtor did not attempt to refute or distinguish any of the case law relied upon by the Landlord. *See* Motion at ¶¶ 20-27.

18. Instead, the Debtor relies on two bankruptcy court decisions, *Harrison* and *FPSDA I*, to attempt to extricate both itself from its dilatory shortcomings as well as the Lease from the mandates of Section 365(d)(4), asking the Court to use its equitable powers instead to somehow smooth over its shortcomings and mistakes. The facts the Debtor relies on to make its argument on this legal point are not in dispute—that there is a lease and related promissory note stemming from a business sale—but as a matter of law these facts do not entitle the Debtor to the relief it is seeking.

19. The Debtor bases its argument on the fact that when the Debtor purchased the Diner from 518 Metropolitan in exchange for cash and the Promissory Note, the Debtor also entered into the Lease with the Landlord. And, as both sides agree, the Debtor would not have given 518 Metropolitan the cash and the Promissory Note unless the Landlord also entered into the Lease with the Debtor, and 518 Metropolitan and the Landlord would not have sold the Diner or leased the Premises to the Debtor unless both the Lease and Promissory Note were executed and delivered.

20. What is before the Court is a typical transaction where a business owner whose affiliate is the landlord sells the business to a buyer. If the holdings of *Harrison* and *FPSDA I* were extended to this common scenario, it would knock the teeth out from the clear Congressional mandate that landlords be given closure within a set period of time regarding what would happen with their leased premises in bankruptcy. Instead, *Harrison* and *FPSDA I*, to the extent correct, should be limited to their facts, which are very different than the ones before the Court.

---

the arrears.

21. In the earlier case, *Harrison*, the debtor's landlord moved for an order compelling surrender of two leased premises due to the expiration of the time under Section 365(d)(4). 117 B.R. at 571. The court denied the motion because the "Motor Fuel Station Leases" were executed contemporaneously with "dealer agreements," and the court felt that these integrated agreements should not have to be assumed by the Bankruptcy Code's deadline for assuming leases but rather the later deadline for assuming the franchise dealer agreements. *Id*.

22. The debtor in *Harrison* successfully argued to its court that "the dealer agreements are the <u>overall agreements</u> between the debtor and Shell Oil; and that the dealer agreements included each…Motor Fuel Station Lease" and that "these writings must be read as one agreement governing the conduct of the debtor with respect to the two non-residential real property leases in question." *Id*. at 571-72 (emphasis added).

23. The court observed that "a petroleum products franchise presents a different model where there are leases as well as dealer agreements governing the relationship between the parties." *Id*. at 572. The court went on to describe in detail the ways in which both agreements govern the ongoing refiner/dealer franchise relationship, even citing certain federal law defining a gasoline station "franchise" as including a lease between the refiner and dealer for a gas station property for selling motor fuel, as well as a contract between a refiner and dealer under which the operator purchases and sells gasoline under the trademark of the refiner. *Id*.

24. Based on the foregoing, the *Harrison* court concluded that the multiple executory contracts essentially fell under the umbrella of the dealer agreement, and that the later deadline applying to non-lease executory contracts should apply. *Id*.

25. Here, on the other hand, the Promissory Note cannot be considered an executory contract because it has material obligations—indeed any obligations—only on the Debtor's side. Promissory notes and other payment contracts have long been held not to be

10

executory for this reason. *See, e.g.*, *In re Gen. Growth Properties, Inc.*, 451 B.R. 323, 329-30 (Bankr. S.D.N.Y. 2011) (finding debtor could not assert that the promissory note was an executory contract due to "the obvious fact that the only obligation remaining to be performed by [the debtor] under the Homart Note is repayment and that loan agreements are generally not considered to be executory contracts") (citing *In re Calpine*, No. 05-60200-BRL, 2008 WL 3154763, at *4 (Bankr. S.D.N.Y. Aug. 4, 2008) (finding purchase and loan agreements were not executory); H.R. Rep. No. 95-595, 95th Cong. 2d Sess. 347, reprinted in 1978 U.S. Code Cong. & Admin. News, pp.5963-04 (a 'note is not usually an executory contract if the only performance that remains is repayment")).[11]  Further, in this case, when the Judgment was entered on the Promissory Note, the Promissory Note merged into the Judgment, which does not even constitute an agreement, let alone an executory one. *See Westinghouse Credit Corp. v. D'Urso,* 371 F.3d 96, 102 (2d Cir. 2004 (With respect to an agreement to purchase supermarkets, "a debt created by a contract merges with a judgment entered on that contract, so that the contract debt is extinguished and only the judgment debt survives.").

---

[11] Generally, a prepetition contract is executory when both sides are still obligated to render substantial performance, the failure of one party to do would excuse the other party from further performance. *In re Riodizio,* 204 B.R. 417, 421 (Bankr.S.D.N.Y.1997); *See also In re C & S Grain Co.,* 47 F.3d 233, 237 (7th Cir.1995) (Contract executory where "obligations of each party remain substantially unperformed."). "The executoriness analysis examines an agreement on its face to determine whether there are material obligations that require substantial performance from the parties." *See Shoppers World Community Ctr., L.P. v. Bradlees Stores, Inc. (In re Bradlees Stores, Inc.),* Case No. 00–10633, 2001 WL 1112308, at *8 (S.D.N.Y. Sept. 20, 2001). Here, even if the Promissory Note had not been reduced to a Judgment and was still the operative agreement governing the Debtor's obligation to pay for its purchase of the Diner Business, there is no performance, let alone substantial performance, remaining on the part of 518 Metropolitan. Loan transactions and agreements memorializing them are not executory contracts. *See In re Zenith Laboratories, Inc.,* 104 B.R. 667, 672 (Bankr. D. N.J. 1989) ("The case law is consistent in holding that a loan transaction is not an executory contract if the only performance that remains in the debtor's present or future duty to repay the loan."). "The note, term loan agreement and mortgage are not 'executory contracts' which can be assumed by the Debtor under 11 U.S.C. § 365." *In re Kash & Karry Wholesale, Inc*., 28 B.R. 66, 69 (Bankr. D. S.C. 1982). *See also In re ESS Lambert Assocs.*, 62 B.R. 328, 336 (Bankr. N.D. Ill. 1986) ("A promissory note and mortgage on real property are not executory contracts."). Among typical loan documents are security agreements, like the chattel mortgage granted by the Debtor to 518 Metropolitan, and such "security agreements are not executory contracts within the meaning of § 365 of the Bankruptcy Code." *In re Sts. & Beard Farm P'ship*, 882 F.2d 233, 235 (7th Cir. 1989); *In re Hotel Syracuse, Inc*., 155 B.R. 824, 843 (Bankr. N.D.N.Y. 1993) ("Security agreements are generally regarded as non-executory within the meaning of Code § 365.").

26. Here, the Lease governs the ongoing respective rights of the Debtor and Landlord as it relates to the use and occupancy of the Premises—not a comprehensive dealer or franchise agreement under an arrangement governed by federal statutes. The other agreements include a bill of sale under which title to the Diner Business passed to the Debtor, and the agreements embodying the obligation of the Debtor to pay the purchase price and the security agreement granting 518 Metropolitan a lien in the Diner Business to secure that repayment. *See* 518 Metropolitan's Claim 8-1. There is simply no comprehensive ongoing second executory contract here to justify treating the Lease as its sub-agreement and ignore the requirements of section 365(d)(4).

27. The late Judge Eisenberg, in *FPSDA I*, relied on *Harrison* in a highly factual context highly analogous to that case, but involving a donut store franchise instead of gasoline dealer franchise. 450 B.R. at 394. The court observed that the ongoing franchise agreements between the debtors and Dunkin' Donuts Franchising LLC constituted the debtors' "most significant assets," and that it was "undisputed that these franchise agreements are executory contracts." *Id.*

28. Judge Eisenberg framed the issue as whether the franchise agreements and corresponding leases "should be treated together as a single controlling agreement between the parties" and whether to the extent they constituted "a single controlling agreement," the deadline to assume or reject the entire arrangement should be determined by section 365(d)(2). *Id.* at 396-97.

29. Like in *Harrison*, Judge Eisenberg found that the two sets of executory contracts--the leases and the franchise agreements—together governed the ongoing relationship of the parties, and therefore "constituted one controlling agreement." *See id* at 398. She then turned to whether Section 365(d)(2) or 365(d)(4) should govern the time period by which the debtors had to assume or reject the combined executory contract. *Id.* at 398-99.

30. The court explained that the issue arose because "the assumption of the nonresidential real property lease implicitly requires the assumption of the related executory contract because both agreements are part of a single transaction and must be viewed as one controlling agreement…." *Id.* at 399. Relying on *Harrison*, the court found that there was no difference for purposes of this issue whether the franchise executory contracts were for gas stations or donut shops. *Id*. at 400.

31. Because there were two intertwined executory contracts governing the ongoing relationship between the parties, the court in *FPSDA I* expressed the need to choose between the two deadlines for the assumption or rejection to apply to both contracts. *Id.* The court then looked to the "equities of the situation." *Id*. The court viewed such equities as weighing in favor of applying the later deadline, because "[i]f the lease agreements were to be deemed rejected by section 365(d)(4) because the debtor did not make a determination as to whether to assume or reject the entire integrated transaction, the franchise agreements would be worthless without the debtor's ability to operate a franchise unit at the leased premises, specified in the franchise agreement." *Id*.

32. In the case before this Court, however, there is no second and valuable executory contract that would be rendered worthless such that the later deadline for such a second executory contract should apply. The important contract <u>is the Lease</u>. The Debtor here simply had to decide whether to assume or reject the Lease or seek an extension by the time mandated by Congress. If the Court were to extend the deadline for the Debtor to assume or reject the Lease merely because the Debtor would lose its ability to operate at the leased Premises and thus reorganize, then the statutory mandate would be nullified anytime a debtor misses the statutory deadline for a lease on which its business depends. Such statutory nullification would be contrary to the unrefuted case law that makes clear the deadline is not subject to extension due to excusable neglect. Motion ¶ 20 and footnote 7.

33. The Debtor's inability in this case to make a timely decision to assume or reject the Lease is not due to there being two intertwined executory contracts, with one subject to an early deadline and if it applied, the debtor would in effect lose its right to decide by confirmation whether to assume or reject a comprehensive franchise agreement as in *Harrison* and *FPSDA I*. The Debtor here could easily have moved to extend the deadline from 210 days to 300 days, which would have coincided with the deadline to propose a plan pursuant to 11 U.S.C. § 1121(e). The Debtor offers no reason why it could not have either sought the extension or simply made the decision to assume or reject by the deadline. Instead, it continued its pattern of constantly ignoring deadlines, and when it realized this one had teeth, it seeks the Court to allow it an end run around the statutory prohibition on extensions. Any loss incurred by the Debtor is not a result of multiple executory and comprehensive contracts, but rather the Debtor's failure to comply with its duties as a debtor and do so on time.

34. The other cases the Debtor cites either (a) question the holdings of *Harrison* and *FPSDA I,* (b) limit the holdings to situations where the non-lease executory contract dominates, and/or (c) have nothing to do with the applicability of section 365(d)(4).

35. The Debtor cites *In re A&F Enters., Inc. II*, 742 F.3d 763 (7th Cir. 2014), which involved facts virtually identical to *Harrison* and *FPSDA I*, including an expiration of the time to assume a non-residential real property lease that was tied to a valuable executory franchise agreement. *Id*. at 765. The *A&F* court noted that it was not deciding the issue but only deciding whether to grant a stay pending appeal. *Id.* at 766. The bankruptcy court had ruled that the lease was deemed rejected, holding contrary to *Harrison* and *FPSDA I*. *Id*. at 765. The district court had denied the debtor's motion for a stay pending appeal based on the plain language of section 365(d)(4). *Id*. The circuit court, expressly stating it was not deciding the issue and indicating it would need further briefing, observed that the lease and franchise agreement did appear inseparable, <u>but very much unlike here</u>, the court so ruled

because there were two executory contracts with the "franchise agreement…clearly the dominant contract," and "prioritizing the lease lets the tail wag the dog." *Id.* at 767. If the Debtor's argument prevailed, it would let the non-existent tail wag the dog.

36. The *A&F* court made the interesting observation that if the two contracts were to be treated as one, then logically either the shorter lease deadline or longer general executory contract deadline could apply. *Id.* Of course, given the franchise agreement was clearly the dominant one, <u>if one or the other deadline would apply to both</u>, it would make sense that it be the longer one. *Id.* Judge Eisenberg in *FPSDA I* similarly relied upon the fact that the franchise agreements were the debtors' "most significant assets." 450 B.R. at 394. While the *A&F* court may have aptly observed that the "legal issue does not have a clear-cut answer," *id.* at 768, there is little question that the issue only arises if there is a lease inseparably tied to a dominant second executory contract. Here, there is no other executory contract to which the later deadline could even apply, let alone one that would dominate the Lease.

37. Here, the rent payable over the full lease term was over $6 million, plus many hundreds of thousands of dollars more for reimbursement of Landlord real estate taxes. *See* Frank Dec., para 6, Ex. 1. On the other hand, the Judgment fixed the amount owing under the accelerated Promissory Note at under $1.4 million, a small fraction of the payments to be made over the much longer Lease term. To say that the Judgment is an executory contract that dominates the Lease is contrary to both the law on what constitutes an executory contract and the undisputed facts.

38. The other cases cited by the Debtor have nothing to do with the issue before the Court, but rather address the issue of when cross-defaults may be enforced between two contracts, holding that if two contracts are sufficiently related, a cross-default provisions in them should be enforced. Movants do not disagree this settled law as it is based on the sound rationale that where contracts reflect an integrated transaction, the non-debtor party should be

15

entitled to the benefit of its bargained for rights, and a cross-default in the executory contracts could not be considered prohibited anti-assumption/assignment clause. But these decisions do not suggest that these facts somehow justify overriding a provision of the Bankruptcy Code.

39. Thus, in *In re Liljeberg Enters., Inc.*, 304 F.3d 410, 445 (5th Cir. 2002), the court held that while cross-default provisions are inherently suspect in the bankruptcy context as possible artificial anti-assignment clauses, such provisions should be enforced to give the non-debtor party the benefit of the bargain where a single transaction was memorialized in more than one contract. Accordingly, in the case at bar, if the Lease had not been rejected under section 365(d)(4)(A) and the Debtor timely sought to assume it, the Debtor would have been required to promptly pay the Promissory Note indebtedness, now fixed per the Judgment. But *Liljeberg* has nothing to do with whether the deadline to assume a lease should be extended beyond the statutory maximum.

40. Similarly, the district court in *In re T&H Diner, Inc.*, 108 B.R. 448, 450 (D. N.J. 1989), ruled that the seller of a diner who took back a promissory note and leased the diner premises to the debtor was entitled to payment of the note indebtedness before the debtor could assume the lease. In that case, the issue of timeliness of the motion to assume the lease was not in issue because unlike here, the debtor did not miss the deadline, having filed the motion to assume one month after it filed its chapter 11 petition. *Id*. The Debtor here could easily have done the same or sought an extension but failed to do so.

41. There is no reason to reward the Debtor's habit of ignoring deadlines in this case, and certainly not reward it by overriding the statutory mandate.[12]

---

[12] The other case cited for the proposition that cross-defaults in contracts stemming from a single integrated transaction are enforceable, *Progressive Rest. Sys., Inc. v. Wendy's Int'l, Inc. (In re Progressive Rest. Sys., Inc.)*, Nos. 96-CV-0768E(F), BK 95-14370K, 1997 WL 251508 at *3 (W.D.N.Y. May 8, 1997), similarly has nothing to do with the time to assume or reject, and the debtor in that case appears to have timely filed a plan that sought to assume certain contracts, albeit improperly without curing certain cross-defaults.

B.   **The Debtor's Chapter 11 Case Should be Converted to Chapter 7**

42.   In addition to ruling that the Lease has been rejected by matter of law and ordering the Debtor to immediately surrender the Premises to the Landlord, the Court should convert the case to chapter 7.

43.   The Debtor has not disputed missing a myriad of deadlines, which can be summed up as follows: (a) failures to follow two Court directives, one to comply with the requirement of the Local Bankruptcy Rules to file a LBR 1007-4 affidavit and the second to file retention applications for professionals, some of whom the Debtor has been using since the Petition Date; (b) the requirement to file--on a timely basis--operating reports (and even relying in its Objections on a supposed rosy (and late) yet to be filed operating report it says it intends to file for March); and (c) the requirement to use professionals only with court approval.[13]  See Motion ¶¶ 48-50.  Thus, Movants have demonstrated cause to convert the Debtor's case.

44.   Furthermore, the Movants have demonstrated independent of the foregoing cause, cause in the form of continuing losses and the absence of a likelihood of rehabilitation. First, the Debtor has not rebutted the showing that it is losing money.  The first two operating reports for the year show that the Debtor was losing money on a cash basis.  The Debtor claims that based on a due but not yet filed operating report, things are picking up.  But the Debtor has utterly failed to address the fact that administrative expenses continue to accrue with nearly eight months of expenses from the Debtor's counsel, accountants, special counsel and possibly an unretained consultant the Debtor hired to help it with the Diner business, plus accrual of substantial Judgment interest and Landlord's contractual attorneys' fees.  All of these expenses eat into the money available to the estate's creditors, including the $679,000 the Debtor represents it is

---

[13] The Debtor's asserts as an excuse seems the fact that the U.S. Trustee may be having issues with the retentions, but the excuse ignores that fact that had the Debtor submitted them eight months ago, those issues

17

holding. Without addressing those accruals, the Court, U.S. Trustee and creditors are in the dark regarding the real level of losses. The Court need not find substantial losses, only that there is some continuing diminution in value based on the language of section 1112(b)(4)(A). *See In re Taub*, 427 B.R. 208, 231 (Bankr. E.D.N.Y. 2010). If the operating reports show only losses so far this year or break even or even modest profit after the report for March gets filed, but do not take into account ongoing substantial accruals, then there are undoubtedly continuing losses. *See* Motion ¶¶ 38-40.

45. Second, the Debtor has not refuted the Movants' argument that the Debtor cannot rehabilitate its business. Even if the Debtor is correct that the Lease was not rejected, it still must cure $422,563.54 in arrears under the Lease[14] and $1,465,431 for the Judgment with interest to May 5, 2022 at the judgment rate of 9%.[15] As the Debtor's own cases show, to assume the Lease it will have to cure the cross-default, which here requires prompt payment of the Judgment on the Promissory Note indebtedness. *See* 11 U.S.C. § 365(b).

46. The only possible way that the Debtor could confirm a plan would be to sell the Diner or its assets, but a liquidating plan is not what is meant by "rehabilitation" in section 1112(b)(4)(A). *See* Motion ¶ 43. "Under a chapter 11 one is certainly entitled to file a plan of liquidation. That is not rehabilitation, that is a reorganization." *In re Kanterman*, 88 B.R. 26, 28 (Bankr. S.D.N.Y. 1988); *see also Loop Corp. v. U.S. Tr.*, 379 F.3d 511, 516 (8th Cir. 2004) ("Courts have consistently understood 'rehabilitation' to refer to the debtor's ability to restore the viability of its business."); *In re The Ledges Apartments*, 58 B.R. 84, 87 (Bankr. D. Vt. 1986) ("Rehabilitation is not reorganization … Rehabilitation, … may not

---

could have long ago been resolved in one way or the other.
[14] *See* Landlord's Claim 7-1 on the Court's claims register (also attached as Exhibit D to the Objections).
[15] *See* 518 Metropolitan's Claim 8-1 on the Court's claims register (also attached as Exhibit D to the Objections), which calculates the Judgment amount plus interest through February 28, 2022, plus per diem interest of $338 through the return date of the Motion.

include liquidation."); *In re Landmark Atlantic Hess Farm, LLC*, 448 B.R. 707, 714 (Bankr. D. Md. 2011) ("Courts have held that rehabilitation is not synonymous with reorganization.").

47. Accordingly, the Movants have demonstrated cause in the form of continuing losses and the absence of a likelihood of rehabilitation.

48. In these circumstances, cause exists for conversion or dismissal, and conversion is in the best interests of creditors. With the Lease rejected (unless it is not to be treated as a lease), the Landlord's damages will be capped by the statute, and a trustee can liquidate the remaining assets of the estate, investigate undisclosed transfers to creditors, insiders and non-insiders, and distribute the $676,000 in the Debtor's DIP accounts and the proceeds of such assets and investigation.

## C. **Court Ordered Mediation is Not Appropriate Here**

49. Not all matters are appropriate for mediation, particularly when mediation is used or perceived to be used for delay, or to impair a party's substantive rights, like the Landlord's statutory right to immediate surrender of the Premises.

50. Pre-petition, the Debtor delayed using available government assistance funds for a year or more to cure the arrears owing Movants, which resulted in Movants having to go to Court and obtain a prompt adjudication of their rights in State Court. Post-petition, the Debtor has delayed this case for nearly eight months, doing nothing but retaining bankruptcy counsel and setting a bar date, and failing to satisfy numerous chapter 11 requirements on a timely basis, several of which remain uncorrected to this day (e.g., LBR 1007-4 affidavit, retention submissions for special counsel, accountant, broker and consultant, habitually late operating reports, etc.). Debtor's continuing dilatory tactics have resulted in Movants having to make this Motion. Mediation should not be allowed to delay a swift end to this bankruptcy case, through a prompt liquidation by a chapter 7 trustee.

51. After over two years of unexcused delay, and a history of using delay to extract unwarranted concessions Movants could not afford, the Movants have little appetite to engage with the Debtor in more of the same, particularly when after such years of delay and failure to pay rent, the Landlord is entitled to get back its property. Movants would prefer the Court to hold the Debtor to all Court and statutory and rule-based deadlines and rule on the legal issues presented by the Motion, which will resolve this case in short order.

## **CONCLUSION**

**WHEREFORE**, Movants respectfully submit that, for the reasons set forth herein and in the Motion the Court should enter an order directing the Debtor to immediately surrender the Premises to Landlord and converting the case to one under Chapter 7 and deny the Debtor's cross motion in it entirety.

Dated: Garden City, New York
April 29, 2022

CULLEN AND DYKMAN LLP

By: /s/ *Thomas R. Slome*
Thomas R. Slome
100 Quentin Roosevelt Boulevard
Garden City, New York 11530
(516) 357-3700

*Counsel for 514 Fioto Property Corp.
and 518 Metropolitan Avenue Corp.*