## THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In Re: | ) | |
| Sid Boys, Corp. d/b/a Kellogg's Diner, | ) | Case No. 21-42207-ess |
| | ) | Chapter 11 |
| Debtor. | ) | Hon. Elizabeth S. Stong |

## DEBTOR'S JUNE 24, 2022 DISCLOSURE STATEMENT TO
## PLAN OF REORGANIZATION

### I. Introduction

The Debtor is a well-known, almost 100 year old diner. The Debtor believes that there is no inherent flaw in its business model that caused the financial distress that compelled it to file for bankruptcy protection under Chapter 11 of Title 11 United States Code. Rather, the Debtor is another business victim of the Covid-19 pandemic. For almost exactly two years, the Diner remained under governmental restrictions of varying degrees, and it was not until March 7, 2022, that all such restrictions were lifted. Since that time, the Debtor has shown it is a profitable enterprise, has already picked itself up off the mat, and is in position for successful operation if this Plan is confirmed. The Debtor is able to pay all costs of case administration and all past due rent on the Plan's Effective Date. The Debtor is also able to cure the defaults under its Chattel Mortgage and to make the same payments to the Chattel Mortgagee holding a blanket lien on its assets that were provided in the contract documents with that creditor. The Debtor will also pay its unsecured creditors in full over 60 months, plus reasonable interest.

### II. Plan Summary

The Debtor's Plan is a "100% " Plan, which means that all creditors will be paid in full over required/reasonable time periods. A Chapter 11 Plan, which is a debtor's proposal to its creditors as to how it will pay (including any compromises) its debts, requires that a debtor divide most of its creditors (those holding "Claims" against it) into "Classes." Without utilizing

legal jargon, exceptions, or nuances, as a practical statement, this means that creditors holding similar types of Claims (or interests if they are shareholders or other types of ownership) should be grouped together in a Class for purposes of voting whether to accept or reject a Plan. Classification helps ensure that each creditor gets a fair voice. For purposes of this Plan, the Debtor has grouped its various creditors into the following Classes and treatment of their Claims.

| Class Identification | Estimated Allowed Amount | Proposed Treatment |
|---|---|---|
| **Class 1 Administrative Expense Requests.** | $150,000 | All debts incurred during the Bankruptcy Case, but as yet unpaid, will be paid in full upon the Effective Date or as otherwise agreed upon by the Claimaint. These include the Claims of: (i) the Debtor's attorneys and accountants, the U.S. Trustee's Fees, and (ii) debts incurred by the Debtor after the commencement of its Bankruptcy Case in the ordinary course of its business. The exact amount of these Claims is not known at this time; however for purposes of this Disclosure Statement they have been estimated at $150,000. Because these expense requests did not arise prior to the Petition, they are not the type of claim that votes on the Plan. |
| **Class 2 Secured Claim of 518 Metropolitan Ave. Corp.** | $1,372,711 | This claim will be paid by de-accelerating the pre-bankruptcy non-final judgment against the Debtor in 518 Metropolitan's favor, and curing the approximately 25 past-due payments of $16,877 each (a total of $421,925) in 20 equal monthly payment of $21,096 beginning on the Effective Date, paying 518 Metropolitan's reasonable attorneys' fees estimated at $25,000 on the Effective Date, and resuming the regular Note payments of $16,877 on the Effective Date. **This Class is Unimpaired.** |
| **Class 3 Priority Claim of New York Department** | $5,829 | Paid in cash on the Effective Date. **This Class is Unimpaired.** |
| **Class 4 Rent Claim of 514 Fioto Property Management.** | $422,564 | This claim constitutes past due rent, and will be paid on the Effective Date of the Plan. **This Class is Unimpaired.** |

| Class Identification | Estimated Allowed Amount | Proposed Treatment |
|---|---|---|
| Class 5 General Unsecured Claims. | $160,780 | These claims are those owed to utility companies, a law firm, and other vendors. They will be paid 100% in 60 equal monthly collective installments estimated at $2,961 at 4% interest. **This Class is Impaired.** |

## III. The Debtor's Operations And History

A.  History and Events Leading to the Chapter 11 Filing.

Kellogg's Diner is a nearly century year old institution, and a staple of the Williamsburg neighborhood. 518 Metropolitan Ave Corp. ("518 Metropolitan") is owned by the decedent's estates of two brothers, Fiotodimitrakis Fiotos and Antonios Fiotodimitrakis, and the brother of the decedents, Frank Fiotos (collectively, "the Fiotos Brothers"). Two of the Fiotos Brothers emigrated to the United States in the 1960s, and began working in diners as dishwashers and cooks to save sufficient monies first to rent and eventually purchase the Diner in 1973. The third brother joined the first two soon afterwards, with each becoming a 1/3 owner of 518 Metropolitan.

As 518 Metropolitan itself has put it in filing in this Court, under the ownership of the Fiotos Brothers, the Diner experienced decades of up and down business operations, surviving many setbacks. One such setback was like the Pandemic in that it was not of their own making—a fuel truck crashed into the Diner and exploded, destroying the premises and the Fiotos Brothers were forced to rebuild the facility. Around 2008, the Fiotos Brothers made major renovations to the premises. Not long afterwards, the Fiotos Brothers began to plan for retirement and decided to sell the business when Antonios's health began to fail.

On or about September 19, 2013, the Fiotos Brothers sold the Diner to the Debtor, whose owner was Christos Siderakis ("Chris"). The Debtor entered a 30 year lease ("Lease") of the Diner Premises and as part of the same integrated transaction, purchased the Diner's equipment and other hard operating assets, giving 518 Metropolitan a security interest in all those assets and signing a promissory note ("Note") for the purchase price. The current annual rent is $258,421.20, with annual increases provided for thereunder. Under the Lease, the Debtor is responsible for the payment of the real estate taxes on the premises and 518 Metropolitan's legal expenses in enforcing the Lease. Things went well for both sides of the transaction until April of 2018, when Christos passed away unexpectedly at the age of 49, with no life insurance to help support his wife, Irene Siderakis ("Ms. Siderakis"), and their four young boys, then about 8, 12, 13, and 15 years old.

Up until that time, Ms. Siderakis had been a stay-at-home mother. Upon her husband's untimely death, she did not know how to run the business, or even if she was able to do so. However, putting her fears aside, she opted to learn at a sprint how to run a restaurant rather than sell it in order to show her children how to persevere through difficult times. Rising to the challenge, Ms. Siderakis began to operate the Diner herself while also rearing the four children and coping with her husband's death. As an added bonus, operating the restaurant made her feel closer to her husband by getting to experience first-hand all of the hard work he had put in to help provide a life for her and her children.

Ms. Siderakis focused on the basics first: making sure her bills and employees were paid. She was able to juggle all those myriad responsibilities until, less than two years after Chris's death, the Covid-19 pandemic turned the world—and every New York City restaurant—upside down. At least so far, the effects of the Pandemic are a matter of historical knowledge and need

no great elucidation. Government health and other regulations forced the Diner to close entirely for periods of time and thereafter imposed various degrees of restrictions such as indoor dining limits and vaccine mandates, as well as masking and isolation mandates for the staff. In addition to the challenges caused by the pandemic affecting restaurants across the city, the Diner specifically faced one challenge after another. Ms. Siderakis herself suffered a serious battle with Covid-19 in March of 2020, early in the Pandemic before any of the subsequent variants was identified, before there were any vaccines or many post-infection treatments, and she became very ill. She opened the restaurant about two months later, after she had recuperated, and the very day after finally receiving a negative test result (during a time where continued positive results were not well understood).

During this period, the Debtor applied for and received two "PPP" loans, first for $206,600 and then $256,234. The PPP loans were used for payroll expenses as the program intended, as well as approximately 40% of the first round of PPP being paid to 518 Metropolitan and 514 Fioto for rent and Note payments. Indeed, throughout the entire pandemic, Ms. Siderakis kept as employees all the workers who wanted to stay, opting at times to pay them instead of herself. Both PPP loans have now been forgiven, The Debtor was current on its other obligations through the end of May, 2020, the heart of the Pandemic darkness. The Debtor later received a grant from the State of New York in the amount of $647,181.

The Diner is located on the corner of its street right above a subway stop. At times, this location was an asset and helped it become so iconic. Throughout the remainder of 2020 and 2021, however, this was a huge detriment to the business because it meant there was virtually nowhere it could put outdoor tables. Thus, unlike many restaurants that at least were able to expand their outdoor dining and generate income from it during the pandemic, the Diner

remained nearly entirely indoor place, with only three, small outdoor tables. The continuing pandemic restrictions on indoor dining, mask mandates, and vaccine mandates ground down the business to a fraction of its former self through no fault of Ms. Siderakis.

In fact, Ms. Siderakis did everything she could to help save and even improve the business in creative ways. She was and is a hands on boss who does everything from bussing tables to standing behind the register. During the protests in the summer of 2020 and the damage to many store fronts that occurred across the nation at the same time, Ms. Siderakis even slept in the diner to try and protect it. Ms. Siderakis has always embraced her customers as family, who showed their overwhelming support during the pandemic when customers contributed about $100,000 to a Go Fund Me page. Ms. Siderakis found that she loved connecting with her customers, especially during this time of great turmoil when many felt divided and, quite literally, distanced. The Diner also received support from its vendors, who kept the business running even when it began to fall behind on bills, because they had faith in the business and in Ms. Siderakis in particular, and because before the pandemic in Ms. Siderakis' hands it had been a good customer that always paid its bills.

In late 2020, it was clear that the Pandemic restrictions on restaurants would not soon be lifted. As it had with its other creditors, the Debtor initiated negotiations with 518 Metropolitan and 514 Fioto regarding rent and Note payments. However, these creditors insisted upon payment in full. Thereafter, 518 Metropolitan filed a lawsuit against the Debtor on April 26, 2021 in the Supreme Court of Kings County, New York, Case No. 509696/2021. This lawsuit did not include any claim for past due rents because of a government moratorium on actions to collect rent, but in papers filed in the Bankruptcy, 514 Fioto alleges the pre-bankruptcy rent arrearage to be base rent of $331,266.23, plus additional interest and real estate taxes for a total

of $422,563. On July 30, 2021, 518 Metropolitan obtained a judgment in the amount of $1,372,711.80, which was the accelerated amount due under the Note. The Fiotis Brothers assert that they have demanded full payment because their families require the money "to make ends meet." This contention is highly contested by the Debtor.

While the lawsuit was ongoing, Ms. Siderakis remained open-minded as new opportunities for the business arose, such as expanding the available hours and platforms of delivery service. She also began to put her college degree in Public Relations, which she earned in Greece, to good use, and has become a strong, recognized voice of the restaurant industry. This part came more naturally to her, and she thinks her husband would be proud of how good she is at it. Only a few weeks before filing the Bankruptcy, the Diner, Ms. Siderakis, and her boys were all featured in a full-page article in the New York Times, "How the Owner Of a 24/7 Diner Spends Her Sundays." Unfortunately, final efforts by the Debtor to resolve the judgment with 518 Metropolitan were unsuccessful, and led to the filing of the Petition on August 28, 2021. The Debtor filed as a Small Business case.

B. Chapter 11 Financial Performance.

Since the commencement of the Debtor's Chapter 11 Case, the Debtor has operated under the jurisdiction of the Bankruptcy Court pursuant to the provisions of the Bankruptcy Code. During the pendency of the Bankruptcy Case, the Debtor has filed and submitted to the Bankruptcy Court detailed monthly statements reflecting its operations, cash flow including individual items such as payroll, profit and loss, and financial condition, summaries of which are more fully described below.

The Chapter 11 period also gave the Debtor the opportunity to stabilize its financial operations, and subject to its final tax preparation to confirm it, to turn a profit of $111,978, in

the past four months, or a monthly average of $27,994. Profits are expected to increase as the Debtor puts into place further revenue raising operations. Most notably, the Debtor was still subject to Covid restrictions such as vaccine mandates until March 7, 2022. Since their expiration, sales have improved more than $60,000 per week. Although it is too early to speak with certainty, this would generate sales of more than $3 million per year. Moreover, on or about March 16, 2022, the Debtor successfully campaigned for and was added to the New York State Historic Business Registry, which was established during the pandemic to honor, recognize, and help promote historic businesses throughout the State of New York. This is reasonably expected to increase sales. Since the filing of its Petition, the Debtor has also entered a contract with Profit Cookers in February, 2022. which the Debtor preliminarily estimates has generated increased sales and will closely monitor the effects of this new contract to help ensure its profitability. The Debtor also recently added "Comedy Nights" that show a weekly sales increase.

The Debtor has also been working with a consultant for further improvement to its operations, who has recommended that it can lower food costs by bidding suppliers, which could result in lowering of food costs and generate additional profits. In addition, although current U.S. inflation will have certain unknown effects on the economy depending on how high it gets and how long it lasts, the Debtor will attempt to alter its menu prices to increase income. The Debtor's analysis also shows that if it hires more workers and eliminates overtime, it may be able to increase its profits, as well as by careful "shopping" to reduce ordinary operational expenses such as insurance, janitorial services, and cleaning supplies. Altogether, these items could add significant annual profit. The Debtor is not predicting a sort of "opposite" of Covid effect where everything goes 100% to the good and that all of these changes in operations will produce the highest possible increased profit, although that remains possible. However, having survived the

pandemic and being well positioned to institute these Plans, the Debtor believes that overall, these operational changes will produce a substantial positive result.

B. Other Events During The Chapter 11.

On or about April 11, 2022, creditors 514 Fioto and 518 Metropolitan sought an order directing the Debtor to immediately surrender the premises at which it operates and to convert the case to a Chapter 7 (the "Landlord Motion"), contending that the time had expired for the Debtor to assume the non-residential real property lease at which the Debtor's business operates. Debtor objected to the motion on the general basis that the time to accept or reject the lease was governed by 11 U.S.C. § 365(d)(2) rather than 11 U.S.C. § 365(d)(4), and therefore had not yet expired, because the lease was part of a comprehensive, integrated executory contract under the Sale of Business Agreement, which incorporated a Security Agreement, Promissory Note, Net Net Lease, and other related documents. The parties went to a mediation following the Landlord Motion, but did not reach a resolution, and the Court has not yet ruled on the creditor's motion.

As further set forth herein, and in conjunction with the Debtor's objection to the Landlord Motion, the Plan assumes the Debtor's Sale of Business Agreement and related, constituent, and integrated Lease and Chattel Mortgage, and promissory note agreements pursuant to §§ 365(d)(2) and 1123(b)(2).

### IV. Documents Included With This Disclosure Statement

In order to assist creditors with making an informed decision whether to accept or reject the Plan and to enable them to vote their acceptances or rejections of the Plan, the following documents are included with this Disclosure Statement: **A. The Plan**, attached as <u>Exhibit 1</u>; **B. Ballot for acceptance or rejection of this Plan,** attached as <u>Exhibit 2</u>; and **C. Financial Projections of the Debtor,** attached as <u>Exhibit 3</u>. *Creditors are urged to read all enclosures.*

# V. Description of the Plan

A.    Designation of Classes of Claims and Interests

Generally, Claims are one of three types:

**Secured**—which means the Claimant has collateral for its Claim.

**Priority**—which means the Claimant does not have collateral but still is paid earlier than some or all other creditors who also do not have collateral. Some priority creditors are paid before other priority creditors on the payment ladder.

**Unsecured**—which means the Claimant does not have collateral or the right to be paid before at least one other Class of Creditors.

For the purpose of the Plan, the Claims of the various creditors against the Debtor's Chapter 11 Estate are hereby classified as follows:

**Class 1 Administrative Expense Requests.**

All debts incurred during the Bankruptcy, but as yet unpaid, will be paid in full upon the Effective Date or as otherwise agreed upon by the Creditor. These include the Claims of: (i) the Debtor's attorneys and the U.S. Trustee's Fees, and (ii) debts incurred by the Debtor after the commencement of its Bankruptcy Case in the ordinary course of its business. The exact amount of these Claims is not known at this time; however for purposes of this Disclosure Statement they have been estimated at $150,000. A $25,000 retainer held in trust by the Law Offices of Rachel L. Kaylie that will be applied to fees owed to that firm. Because these expense requests are did not arise prior to the Petition, they are not the type of claim that votes on the Plan.

**Class 2 Secured Claim of 518 Metropolitan.**

This claim will be paid by de-accelerating the pre-bankruptcy non-final judgment in 518 Metropolitan's favor, and, pursuant to 11 U.S.C. § 1124(2), curing the approximately 25

past-due payments of $16,877 each (a total of $421,925) in 20 equal monthly payment of $21,096 beginning on the Effective Date, paying 518 Metropolitan's reasonable attorneys' fees estimated at $25,000 on the Effective Date, and resuming the regular Note payments of $16,877 in the ordinary course of business on the Effective Date. **Pursuant to 11 U.S.C. 1124(2), this Claim is Unimpaired.**

**Class 3 Priority Claim of New York Department.**

This claim is estimated at $5,829 and will be paid in cash on the Effective Date. **This Claim is Unimpaired.**

**Class 4 Rent Claim of 514 Fioto Property Management.**

This claim constitutes past due rent. It is estimated at $422,564, which will be paid on the Effective Date of the Plan and future rents will be paid in the ordinary course of business under the Lease. **Pursuant to 11 U.S.C. 1124(2), this Claim is Unimpaired.**

**Class 5 General Unsecured Claims.**

These claims are estimated at $160,780, are those owed to utility companies, and legal fees. They will be paid 100% in 60 equal monthly collective installments estimated at $2,961 at 4% interest. **These claims are Impaired.**

**2. Distributions under the Plan**

The Effective Date of this Plan is September 19, 2022, which in an anniversary date of the original 518 Metropolitan secured indebtedness, provided that the Confirmation Order is final and not appealable, has not been vacated, and is not subject to a stay. If any of those conditions exists on September 19, 2022, the Effective Date is the fifth business day after the Debtor has notice that such condition has ceased to exist.

**3. Plan Disbursing Agent.**

The Debtor will serve as the Disbursing Agent for the Plan and the Debtor will administer the Plan and any payments called for herein. No separate compensation will be paid to the Disbursing Agent for performing the services called for under the Plan.

**4. Unclaimed Distributions**

With respect to unclaimed distributions by either a Holder of an Allowed Administrative Claim or a Holder of an Allowed Priority Claim, if such Holder fails to negotiate a check issued to such Holder within ninety (90) days of the date such check was issued, then the Debtor may provide written notice to such Holder stating that unless such Holder negotiates such check within thirty (30) days of the date of such notice, the amount of cash attributable to such check will be deemed to be unclaimed, such Holder's Claim will no longer be deemed to be Allowed, and such Holder will be deemed to have no further Claim in respect of such check and will not participate in any further distributions under the Plan.

If a distribution to such Holder is returned due to an incorrect or incomplete address for the Holder of such Allowed Claim, as to such distribution within one hundred twenty (120) days of the return of such distribution, then the amount of cash attributable to such distribution will be deemed to be unclaimed and such Holder will be deemed to have no further Claim in respect of such distribution and will not participate in any further distributions under the Plan.

Any unclaimed cash distribution as described above will be distributed to other Holders of Allowed Claims in the same Class as the unclaimed distributee, utilized to pay Allowed Claims of higher priority, or transferred to the Debtors for further distribution to the creditors pursuant to the Court's directive.

## 5. Transfers of Claims

In the event that the Holder of any Claim will transfer such Claim on and after the Effective Date, it will immediately advise the Reorganized Debtor and its counsel in writing of such transfer. The Reorganized Debtor will be entitled to assume that any Holder has made no transfer of any Claim unless such parties have received written notice to the contrary. Each transferee of any Claim will take such Claim subject to the provisions of the Plan and to any request made, waiver or consent given, or other action taken hereunder and, except as otherwise expressly provided in such notice, the Reorganized Debtor will be entitled to assume conclusively that the transferee named in such notice will thereafter be vested with all rights and powers of the transferor under the Plan.

## 6. Discharge of Claims

Except as provided for in the Plan, all holders of Interests shall be precluded from asserting against the Reorganized Debtor, or its assets, on account of such Interests, any further right, title or interest based on any act, omission, transaction or activity of any kind or nature that occurred before the Effective Date, whether or not such holder filed a proof of interest in Case.

As of the Effective Date, all entities that have held, currently hold or may hold a Claim against the Debtor are permanently enjoined from taking any of the following actions on account of any such Claim against the Reorganized Debtor as provided in the Plan or the Confirmation Order: (i) commencing or continuing in any manner any actions or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; and (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation or taking any other action prohibited by 11 U.S.C. § 1141(d)(5), entitled: "Discharge."

**7. State and Local Fees**

Pursuant to § 1146(a) of the Bankruptcy Code, the issuance, distribution, transfer or exchange of any security or the making, delivery or recording of any instrument of transfer pursuant to, in implementation of or as contemplated by the Plan or any Plan Document, or the revesting, transfer or sale of any real or personal Property of, by or in the Debtor pursuant to, in implementation of or as contemplated by the Plan or any Plan Document, or any transaction arising out of, contemplated by or in any way related to the foregoing, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangible or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, UCC filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall be, and hereby are, directed to forego the collection of any such tax or governmental assessment and to accept for filing and recording any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**8. Modification of Plan**

The Debtor may modify the Plan at any time prior to the entry of the Confirmation Order provided that the Plan as modified and the Disclosure Statement meet applicable requirements of the Bankruptcy Code and the Rules.

After the Confirmation Date and before the Effective Date of the Plan, the Debtor or the Reorganized Debtor, as the case may be, may modify the Plan in a way that materially or adversely affects the interests, rights, treatment, or distributions of a Class of Claims, provided that (a) the Plan, as modified, meets applicable Bankruptcy Code requirements; (b) the Debtors obtains Bankruptcy Court approval for such modification, after notice and a hearing; (c) such modification is accepted by at least two-thirds in amount, and more than one-half in number, of

Allowed Claims or Allowed Equity Interests voting in each Class adversely affected by such modification; and (d) the Debtors comply with Section 1125 of the Bankruptcy Code with respect to the Plan, as modified.

In the event any Class of Claims votes against the Plan, and the Plan is not revoked or withdrawn, the Debtors hereby requests, and will be allowed, to modify the terms of the Plan to effect a "cramdown" on the dissenting Class or Classes by (a) restructuring the treatment of any Class on terms consistent with Section 1129(b)(2)(B) of the Bankruptcy Code, or (b) deleting distributions to all Classes at or below the level of the objecting Class, or reallocating such distributions, until such impaired senior Classes are paid in accordance with the absolute priority rule of Section 1129(b) of the Bankruptcy Code. The Debtors may make such modifications or amendments to the Plan and such modifications or amendments will be filed with the Bankruptcy Court and served on all parties in interest entitled to receive notice of the Confirmation Hearing. No such modifications will require any re-solicitation of acceptances as to the Plan by any Class of Claims unless the Bankruptcy Court will require otherwise.

The Debtor may, with approval of the Bankruptcy Court and upon notice to the Office of the United States Trustee and counsel for each respective Class of Creditors, and so long as it does not materially and adversely affect the interest of any Creditors, remedy any defect or omission, or reconcile any inconsistencies in the Plan or amend the Plan in such manner as it may be necessary to carry out the purposes and effect of the Plan, or sever a clause or provision of the Plan if necessary to satisfy the Bankruptcy Code requirements.

Nothing in this Article shall be construed to limit the Debtor's right to modify the Plan as otherwise provided in Title 11 U.S.C. Notwithstanding any provision of the Plan to the contrary, the Debtors reserves any and all rights it may have to challenge the validity, perfection, priority,

scope, and extent of any Liens in respect to any Secured Claims and the amount of any Secured Claims, the Holders of which have not accepted the Plan.

## 9. Revocation or Withdrawal of the Plan

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Plan is revoked or withdrawn, or if Confirmation of the Plan does not occur, then the Plan will be deemed null and void in all respects and nothing contained in the Plan will be deemed to (a) constitute a waiver or release of any Claims by or against, or Equity Interests in, the Debtor or any other person or other entity, or (b) prejudice in any manner the rights of the Debtor or any other Person or other Entity in any further proceedings involving the Debtor.

## 10. Risk Factors

Certain substantial risk factors are inherent in most commitments made pursuant to a plan of reorganization in a Chapter 11 case. If such plans are accepted, it is usually because they represent a greater hope for returns and dividends than in a liquidating Chapter 7 case. The Debtor's business is tied to the hospitality market as such it is dependent on the changes in that market. All of the risk factors inherent in commitments made pursuant to a Plan of Reorganization in Chapter 11 cases are present in this case. The Debtor believes that the Plan proposes a viable repayment of its debts.

## 11. Tax Consequences of Plan

Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, and/or Advisors, as the Debtors their attorneys and accountants make no representation warranties, estimates, or opinions on the tax effects of Plan confirmation or any claims and/or creditor.

Pursuant to section 166 of the Internal Revenue Code (the "IRS Code"), the amount of

any debt discharged in this proceeding may be eligible to be deducted by creditors to the extent of their tax basis in the debt discharged. Creditors are advised to consult with their tax advisors with respect to the specific consequences to them resulting from the discharge, which will depend upon their specific circumstances.

The potential tax consequences to the Debtor, any successor or hypothetical investor could be significant. The discharge of a debt under the Chapter 11 of the Bankruptcy Code generally will not result in income to the Debtors pursuant to IRS Code Section 108. However, tax attributes on a going forward basis such as net operating losses, general business credits, minimum tax credits and capital loss carryovers may be lost or substantially reduced. In addition, the basis for assets, passive activity carryovers and foreign tax credit carryovers may also be reduced. The Debtor is making no representations or warranties regarding the tax effects of the Plan and urges all creditors to consult with their own tax advisors regarding same.

## 12. Assumption and Rejection of Executory Contracts and Leases

Pursuant to §§ 365(d)(2) and 1123(b)(2) of the Bankruptcy Code or otherwise, the Debtor shall assume its Sale of Business Agreement with 518 Metropolitan, which includes all of its related and constituent agreements that together form one unitary, integrated agreement, including that certain 30-year "Net Net Lease" for the premises at 518 Metropolitan Avenue, Brooklyn, New York 11211, of which approximately 21 years remain; that certain 15-year "Security Agreement (Chattel Mortgage)," of which approximately 6 years remain, for restaurant equipment and related furniture and fixtures, and general intangibles, and the payment obligations evidenced by a promissory note. The Debtor shall cure all arrearages and breaches as set forth above. The Debtor's curing of arrearages on the described documents shall reinstate them and make all claims related thereto unimpaired, as the Debtor will thereafter perform its

obligations thereunder and the Claimants shall be considered to have received/receive the indubitable vale of their interests therein.

## 13. Determination of Claims

Unless otherwise ordered by the Bankruptcy Court, and except as to any late-filed Claims, all objections to Claims shall be filed with the Bankruptcy Court by no later one-hundred twenty (120) days following the Effective Date (unless such period is extended by the Bankruptcy Court).

## 14. Acceptance or Rejection of Plan

Each Class of Creditors holding impaired Claims, to wit: Class 5 as of the date hereof, shall be entitled to vote as a class to accept or reject the Plan. If, prior to balloting, the Bankruptcy Court determines that any class other than Class 5 is impaired, then it shall receive ballots in the manner generally provided in this Plan, but the treatment of the claims in such class shall remain the same.

A Class of Creditors shall have accepted the Plan if the Plan is accepted by Creditors of such class that hold at least two-thirds in the aggregate dollar amount and more than one-half in the number of the Allowed Claims of Creditors of such class that vote to accept or reject the Plan.

Any Class of Claims designated as unimpaired shall be deemed to have accepted the Plan pursuant to 11 U.S.C. § 1126(f). However, in the event that any Class of Creditors holding impaired Claims as of the date hereof shall fail to accept the Plan in accordance with Section 1129(a) of the Code, the Debtor intends to seek confirmation of the Plan pursuant to the provisions of Sections 1129(b)(2)(A), (B) and (C) of the Code.

## VI. Plan Feasibility

The Debtor believes that the Reorganized Debtor will have sufficient cash flow to operate profitably and pay all monetary obligations under the Plan. As aforesaid, attached hereto are projections for the Debtor that demonstrates that it will generate sufficient revenue over the life of the Plan to make the payments called for in the Plan. As such, the Debtor believes that the Plan is feasible.

## VII. Liquidation Analysis

Although the Debtor believes that a liquidation analysis is not required for a 100% Plan, nevertheless it provides one as follows. The Plan will return millions of dollars to creditors. A liquidation analysis of the Debtor's assets are estimated as follows:

| | |
|---|---|
| Cash on Hand: | $748,000 |
| Accounts Receivable: | $278,115 |
| The Name "Kellogg's Diner": | $45,000 |
| Chattel Mortgage Assets: | $100,000 |
| Total: | $1,171,115 |

In contrast, under the Plan, creditors 514 Fioto and 518 Metropolitan will be paid in full, for a total of $3,294,814 over the course of the five year Plan, including amounts to cure defaults and to reinstate the executory agreements. Moreover, the remaining 6 years of mortgage payments and 21 years of rent will be reinstated even after the expiration of the five year Plan. This alone dwarfs any possible liquidation value of the Debtor's assets: Moreover, Debtor's general unsecured creditors with claims totaling $160,780 will be paid in full, over the course of the five years, in addition to 4% interest, as well as the State of New York for $5,829, which would otherwise receive nothing in a liquidation.

While not strictly an analysis of the liquidation versus non-liquidation numbers concerning the Debtor, allowing the Debtor to remain in business also means that all of the Debtor's approximately 30 employees will remain employed and not suffer adverse financial consequences of their own by reason of losing their jobs.

## VIII. Officers and Directors

Officers and Directors. The Plan does not contemplate a change in the Debtors management; Irene Siderakis will remain as President.

## IX. Alternatives to the Proposed Plan

Conversion to a Liquidation Case is the likely Alternative. Accordingly, the Debtor believes that confirmation of its Plan is in the best interests of the Creditors and recommends that you vote to accept the Plan.

## X. Purpose of This Document

The purpose of this Disclosure Statement is to provide the Holders of Claims with adequate information to make an informed judgment about the Plan. This information includes, among other things, (a) the procedures for voting on the Plan, (b) a summary of the Plan and an explanation of how the Plan will function, including the means of implementing and funding the Plan, (c) general information about the history and business of the Debtor prior to the Petition Date, (d) the events leading to the filing of the bankruptcy petition, and (e) a summary of significant events which have occurred to date in this bankruptcy case.

This Disclosure Statement contains important information about the Plan and considerations pertinent to a vote for, or against, the confirmation of the Plan. All parties entitled to cast a ballot are encouraged to review this Disclosure Statement carefully.

Unless otherwise defined herein, all capitalized terms used in this Disclosure Statement have the meanings ascribed to them in the Plan. Any other term used in this Disclosure Statement and not otherwise defined shall have the meaning given to it in the Bankruptcy Code.

The summary of the Plan contained herein addresses only certain provisions of the Plan. As a summary, it is qualified in its entirety by reference to the Plan itself and any Plan Documents, which are referred to therein as being filed prior to Confirmation. Upon Confirmation and the Effective Date, the Plan and the Plan Documents referred to therein shall control and bind the Debtor, all of the Debtor's Creditors, and other parties in interest except as expressly set forth in the Plan.

The Plan Documents (i.e. all documents that aid in effectuating the Plan, including the Exhibits), if any, will be filed with the Bankruptcy Court with this Disclosure Statement; provided, however, that the Debtor may amend the Plan Documents through and including the Confirmation Date. Upon their filing with the Bankruptcy Court, the Plan Documents may be inspected in the Clerk's Office during normal business hours or may be obtained from the Debtor's counsel, Rachel L Kaylie, 718.615.9000, Keevan Morgan, and/or Alanna Morgan, at (312) 243-0006.

## XI. Who May Vote

Only the Holders of Claims which are deemed "Allowed" under the Bankruptcy Code and which are "Impaired" under the terms and provisions of the Plan are permitted to vote to accept or reject the Plan. For purposes of the Plan, the Holders of Allowed Claims in the Voting Classes (i.e. Class 4 General Unsecured) is Impaired under the Plan and thus may vote to accept or reject the Plan. Accordingly, a Ballot is being provided to members of the Voting Classes.

## XII. How To Vote

Each holder of a Claim in a Voting Class should read this Disclosure Statement, together with the Plan and other exhibits hereto, in their entirety. After carefully reviewing the Plan and this Disclosure Statement and their respective exhibits, please complete the enclosed Ballot, including indicating your vote thereon with respect to the Plan, and return it as provided below. If you are a member of a Voting Class and did not receive a Ballot, if your Ballot is damaged or lost, please call Rachel L Kaylie, 718.615.9000, Keevan D. Morgan or Alanna G. Morgan, counsel for the Debtor, at 312.243.0006 ext. 101 or 102.

**YOU SHOULD COMPLETE AND SIGN THE ENCLOSED BALLOT AND RETURN IT AS DESCRIBED BELOW. IN ORDER TO BE COUNTED, BALLOTS MUST BE DULY COMPLETED AND EXECUTED AND RECEIVED BY NO LATER THAN THE BALLOT DATE DEADLINE OF _____, 2022, UNLESS SUCH DEADLINE IS EXTENDED BY COURT ORDER.**

All Ballots should be returned and delivered by regular mail, hand delivery or overnight delivery:

Office of the Clerk
United States Bankruptcy Court Eastern District of New York
271-C Cadman Plaza East, Suite 1595
Brooklyn, NY 11201-1800

A copy of the executed Ballot should also be mailed to Counsel for the Debtor:

Rachel L Kaylie, Esq.
Law Offices of Rachel L. Kaylie, P.C.
1702 Avenue Z, Suite 205
Brooklyn, NY 11235
718.615.9000
Fax : 718.228.5988
Email: Rachel@kaylielaw.com

As the holder of an Allowed Claim in the voting Classes, your vote on the Plan is extremely important. In order for the Plan to be accepted and thereafter confirmed by the Court without resorting to the "cram-down" provisions of Section 1129(b) of the Bankruptcy Code as to other classes of Allowed Claims, votes representing at least two-thirds in amount and more than one-half in number of Allowed Claims of each impaired Class of Claims that are voting must be cast for the acceptance of the Plan. The Debtors are soliciting acceptances only from members of the Voting Classes. You may be contacted by the Debtors with regard to your vote on the Plan. "Cramdown" is more fully explained below.

## XIII. Acceptance or Rejection of the Plan

A. Each Impaired Class Entitled to Vote Separately.

The Holders of Claims or Interests in each Impaired Class of Claims or Interests shall be entitled to vote separately to accept or reject the Plan.

B. Acceptance by Impaired Classes.

Pursuant to Section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims will have accepted the Plan if (a) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of at least two-thirds (2/3) in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of more than one-half (2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

C. Best Interests Standard.

The Bankruptcy Code requires that the Plan-meet the "best interest" test, which requires that members of a Class must receive or retain under the Plan, property having value not less

than the amount which the Class members would have received or retained if the Debtors was liquidated under Chapter 7 on the same date. This has been demonstrated in the foregoing "Liquidation Analysis."

D. Confirmation without Acceptance by all Impaired Classes.

If one or more of the Impaired Classes of Claims does not accept Plan, it may nevertheless be confirmed and be binding upon the non-accepting Impaired Class through the "cram-down" provisions of the Bankruptcy Code, if the Plan does not "discriminate unfairly" and is "fair and equitable" to the non-accepting Impaired Classes.

E. No Unfair Discrimination.

The Bankruptcy Code requirement that a plan not "discriminate unfairly" means that a dissenting class must be treated equally with respect to other classes of equal rank. The Debtors Plan does not "discriminate unfairly" with respect to any Class of Claims or Equity Interests because no class is afforded treatment which is disproportionate to the treatment afforded other Classes of equal rank, and the treatment under the Plan follows the Distribution scheme dictated by the Bankruptcy Code.

F. Fair and Equitable Standard .

The "fair and equitable" standard, also known as the "absolute priority rule," requires that a dissenting class receive full compensation for its allowed Claims or interests before any junior class receives any Distribution. The Debtors believes the Plan is fair and equitable to all Classes pursuant to this standard. With respect to the Impaired Classes of Claims, Bankruptcy Code § 1129(b)(2)(B) provides that a plan is "fair and equitable" if it provides that (i) each Holder of a Claim of such a class receives or retains on account of such claim, property of a value as of the effective date of the plan equal to the allowed amount of such claim; or (ii) the

Holder of any Claim or interest that is junior to the Claims of such class will not receive or retain any property under the plan on account of such junior claim or interest.

The Debtor believes that the Plan satisfies the absolute priority rule or any exception thereto. Accordingly, if necessary, the Debtor believes the Plan meets the requirements for Confirmation by the Bankruptcy Court, notwithstanding the non-acceptance by an Impaired Class of Claimants.

G. Non-Confirmation of the Plan.

If the Bankruptcy Court does not confirm the Plan, the Court may permit the filing of an amended plan, dismiss the case, or convert the case to Chapter 7. In a Chapter 7 case, the Debtors Assets would be sold and distributed to the Unsecured Creditors after the payment of all Secured Claims, costs of administration and the payment of Priority Claims.

## XIV. Confirmation Hearing

Pursuant to section 105(d)(2)(B) of the Bankruptcy Code, the Court may order that the hearing ("Consolidated Hearing") on the approval of this Disclosure Statement shall be consolidated with the hearing on the hearing on the confirmation of the Plan, which hearing has been set for _____, 2022 at _____ at the United States Bankruptcy Court for the Eastern District of New York, Courtroom 3585, to be conducted remotely by telephonic conference, whose  Dial-In instructions are as follows: Telephone No. 888.808.6929; Access Code 852.3285. The Hearing may be adjourned from time to time by the Court without further notice except for an announcement of the adjourned date made at the hearing.

Objections to confirmation of the Plan or to approval of the Disclosure Statement shall be filed with the Court on or before _____, 2022 and served by the same date on the Debtors, Debtor's counsel and the United States Trustee.

### XV. Disclaimer

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. ALTHOUGH REASONABLE EFFORT HAS BEEN MADE TO BE ACCURATE IN THIS DISCLOSURE STATEMENT, THE DEBTOR DOES NOT WARRANT THAT THE FINANCIAL AND OTHER FACTUAL INFORMATION AND REPRESENTATIONS CONTAINED HEREIN (WHICH FINANCIAL INFORMATION HAS BEEN PROVIDED SOLELY BY THE DEBTOR, AND NOT BY ITS ATTORNEYS OR ACCOUNTANTS) IS WHOLLY WITHOUT INACCURACY. NO REPRESENTATIONS CONCERNING THE DEBTOR IS AUTHORIZED, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE THAT ARE NOT CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON YOU IN ARRIVING AT YOUR DECISION TO SUPPORT OR REJECT THE PLAN.

# XVI. DEBTOR'S RECOMMENDATION

Once, a fuel truck crashed into the Diner when the Fiotis Brothers owned their own business there. The Fiotis Brothers needed fortune to smile upon them to survive, and both the Diner and the brothers did. Now, the Debtor, Ms. Siderakis, and her family, need the same. Ms. Siderakis has been working tirelessly to turn the Debtor back into a profitable enterprise following the once in a century pandemic, and the Debtor believes that it is in the best interest of the Estate, its Creditors and its Equity Security Holders for the proposed Plan to be approved and, as such, the Debtors urges its Creditors to vote for the Plan.

Sid Boys Corp.

By:    /s/Alanna G. Morgan              /s/ Rachel L. Kaylie
One of its Attorneys                    One of its Attorneys

**Counsel for Sid Boys Corp**
Morgan & Bley, Ltd.                     Rachel L. Kaylie
Keevan D. Morgan                        Law Offices of Rachel L. Kaylie, P.C.
kmorgan@morganandbleylimited.com        1702 Avenue Z, Suite 205
Alanna G. Morgan                        Brooklyn, NY 11235
amorgan@morganandbleylimited.com        P. 718.615.9000
900 W. Jackson Blvd., Suite 4E          F. 718.228.5988
Chicago, Illinois 60607                 Rachel@kaylielaw.com
312.243.0006