# THE UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In Re: | ) | |
| Sid Boys, Corp. d/b/a Kellogg's Diner, | ) | Case No. 21-42207-ess |
| | ) | Chapter 11 |
| Debtor. | ) | Hon. Elizabeth S. Stong |

## MARCUM LLP'S REPLY IN SUPPORT OF ITS
## FIRST INTERIM FEE APPLICATION

Debtor, Sid Boys, Corp. d/b/a/ Kellogg's Diner (the "Diner" or "Debtor"), by and through its counsel, Keevan D. Morgan and Alanna G. Morgan of Morgan & Bley, Ltd., and Rachel L. Kaylie of the Law Offices of Rachel L. Kaylie, P.C., hereby submits Marcum LLP's ("Marcum") Reply In Support of its First Interim Fee Application (the "Fee Application") pursuant to 11 U.S.C. §§ 330 and 331 of the U.S. Bankruptcy Code, requesting $33,483.50 for accounting fees.

## I. Synopsis

Creditors 514 Fioto Property Corp. and 518 Metropolitan Avenue Corp. (together, "Creditors") submit a "limited" objection to Marcum's first interim fee application on the general basis that the Court should wait to hear the fee application of any professional until after a confirmation hearing in the case, if any. [Obj. ¶ 1]. In support thereof, Creditors argue that "the fees of the professionals in this case, particularly when their involvement one way or another will conclude shortly, should be viewed through the lens of the outcome of the case" [Obj. ¶ 13] at a time when "the parties can best assess "the nature, the extent, and the value of the services" and whether the "services were not (I) reasonably likely to benefit the debtor's estate; or (II) necessary to the administration of the estate." [Obj. ¶ 16].

Creditors' proposition is contrary to the Bankruptcy Code, which expressly provides for interim payment in § 331, and case law which has consistently acknowledges that the allowance of such interim payments exists in order to encourage the participation of competent professionals

in the bankruptcy system and avoid saddling those professionals with the financial risk of a case. Case law also consistently divorces the analysis of whether services performed are reasonably likely to benefit the estate or necessary to its administration from a case's ultimate outcome and instead considers the question from the time the services were actually rendered.

Moreover, Creditors rely primarily on the fact that they have "little confidence" in the Debtors' numbers and have outstanding questions regarding the Debtors' finances that they still want answered. *See e.g.,* Obj. ¶¶ 7-12; fn. 1-2. Of course, these purported complaints serve only to highlight the need for a competent accounting professional in this case and therefore in fact supports granting Marcum's first fee application. As the Court will recall, together with Morgan & Bley, Ltd. ("M&B") as additional counsel, Marcum was brought into this case relatively recently—a presence that has allowed for substantial progress to be made in the case, including the Court's finding that it is more likely than not a plan can be confirmed. In that regard, Creditors' objection is surprising, given that more than any other party in interest other than the Debtor itself, Creditors themselves welcomed Marcums's involvement in the case and have called upon Marcum to provide them with myriad financial information. M&B and Marcum are working quickly but diligently to deliver that information,[1] as well as to correct any deficiencies from the commencement of the case regarding the Debtors' paperwork or other information that were otherwise determined by the Debtors' additional professionals to need correcting. It is not an exaggeration to state that without Marcum's involvement, the Debtor's Bankruptcy case may very

---

[1] Much of this information was compiled after the period for which compensation is sought by Marcum. While Marcum's first task was mainly to provide projections, it is now in the second stage of its engagement, which has been tasked largely by these Creditors themselves. While Debtor agrees that before the involvement of Marcum and M&B its providing of information left room for improvement, that was never due to the Debtor's lack of desire to comply with all requests, which it did its best to do. The Creditors unfairly want it both ways–to make the Debtor's professionals work hard, yet starve them. It is not that easy to recreate the wheel on behalf of a debtor. The Creditors should be first in line to advocate for Marcum to be compensated, not carp at the edges of services they themselves requested and are critical to the case whether or not a plan is confirmed.

well not have made it this far. Marcum, which had to hit the ground at a literal sprint without the receipt of any retainer whatsoever, should be awarded its interim fee request.

## II. Legal Standard and Argument

1. Creditors object to Marcum's fee application primarily on the basis that "any fee applications in this case should be heard as final fee applications after a confirmation hearing in this case (if there is one) . . ." [Obj. ¶ 1] and that the application should be heard only after confirmation of a plan because it should "be viewed through the lens of the outcome of the case" [Obj. ¶ 13].

2. The Creditors' cite no precedence in support of this proposition, which makes sense given that the Bankruptcy Code and case law expressly advocate against such an approach. In that regard, 11 U.S.C. § 331 specifically provides for the payment of interim compensation. Courts repeatedly note the importance of professionals being reasonably compensated in order to ensure the participation of competent and qualified professionals in the bankruptcy process and warn of the consequences that follow from a failure to grant interim applications until the end of the case or until the likely results of a case are known to the court. *See e.g., In re ACT Mfg., Inc.,* 281 B.R. 468, 474 (Bankr. D. Mass. 2002) (waiting to grant compensation until the results of the case are likely to be known "ignores the very existence of section 331 and the reason for its adoption, namely, to clarify that professionals do not need to wait until the completion of a case to receive compensation" and to "ensure[] that competent and qualified professionals represent parties in the bankruptcy arena without fear that they will be driven to the brink of financial ruin while awaiting payment for their services"); *In re W. Farmers Ass'n*, 8 B.R. 539, 542 (Bankr. W.D. Wash. 1981) (finding the long range result of failing to grant interim fees in their earned amount "would be to drive qualified counsel away from this Court and out of the bankruptcy practice"

because the "best interests of [the professional] would dictate that it spend its time and energy on behalf of non-bankruptcy clients whom it could bill and expect full payment from in the ordinary course of its practice," asking "Why would any competent firm with any sort of an established clientele spend its time working on a lengthy bankruptcy case, knowing that it might not receive full payment for its services until some indefinite time in the future, if ever?"); *In re UNR Indus., Inc.*, 30 B.R. 613, 618 (Bankr. N.D. Ill. 1983) (professionals "are extremely important to the Debtors' reorganization and should be encouraged rather than penalized for their involvement").

3. Indeed, contrary to the Creditors' suggestion, a case where a debtor's reorganization is unknown can be reason *to* grant an interim fee award. *See e.g., In re W. Farmers Ass'n*, 8 B.R. 539, 541 (Bankr. W.D. Wash. 1981) ("where procrastination is not involved, where it is unknown if the debtor will be able to confirm a plan, where making full payment contingent upon a successful reorganization might result in full compensation never being paid, and where full payment will reasonably assist in rehabilitation, the full interim allowance should be made").

4. That is precisely why the Bankruptcy Code directs courts to consider "whether the services were necessary to the administration of, or beneficial *at the time at which the service was rendered* toward the completion of, a case under this title." *In re Korea Chosun Daily Times, Inc.*, 337 B.R. 758, 765 (Bankr. E.D.N.Y. 2005) (emphasis added); *see also In re Polanco*, 626 B.R. 12, 23 (Bankr. E.D.N.Y. 2021) ("While the lens of hindsight is tempting . . . '[i]n evaluating the award of professional fees, courts objectively consider whether the services rendered were reasonably likely to benefit the estate from the perspective of the time when such services were rendered'" in order to support the "salutary objective that attorneys should not be deterred from undertaking the representation of debtors in bankruptcy cases, including cases that may pose significant challenges and an uncertain outcome, due to a risk of inadequate compensation").

5. This is also why the Bankruptcy Code grants administrative priority to professionals, encouraging their participation and taking on of the "responsibility of representing a company in financial difficulties and steering it through the Chapter 11 process to a successful reorganization." *In re S&Y Enterprises, LLC,* 480 N.R. 452, 455 (Bankr. E.D.N.Y. 2012).

6. Although the results obtained may be considered in granting a fee application, the outcome of a case is only part of one of the well-established twelve *Johnson* factors that Courts use, which primarily focus on other considerations. In that regard, three of the *Johnson* factors are particularly worth highlighting in this case: (3) the skill required to perform the legal services properly; (7) time limitations imposed by the client or the circumstances; and (10) the undesirability of the case. *See In re Nicholas,* 496 B.R. 69, 75 (Bankr. E.D.N.Y. 2011) (identifying the factors outlined in *Johnson v. Georgia Highway Exp., Inc.,* 488 F.2d 714 (5th Cir. 1974)). In a case such as this one, where the Debtor had no plan or disclosure statement on file and was faced with possible dismissal only 11 days prior to retaining additional accounting and legal professionals, the outcome of this case is relevant only to an enhancement of the ordinary fees if a plan is confirmed, not cutting customary fees for stepping into the breach to the hallelujahs of the objecting Creditors.

7. As explained in further detail in the Fee Application, the circumstances of the case at the time Marcum became involved in it presented extreme time constraints and Marcum had to create projections necessary for the Debtor to formulate its plan of reorganization in just a week's time. Because M&B needed to find a competent accounting professional to assist with the projections very quickly, M&B spoke with a number of different prospective professionals about completing the project—at least three of which declined to become involved, demonstrating the undesirability of the project given how quickly the projections needed to be completed. The

projections simply could not have been created without the bandwidth and expertise of a renowned firm like Marcum. In turn, without these projections, the Debtor would not have been able to timely file an adequate plan of reorganization. Indeed, Creditors themselves deemed Marcum's involvement in the case a positive development, and the Debtor is confident that its involvement will continue to benefit the Bankruptcy Case.

8. Creditors also note their continued concern regarding the Debtor's provided financial information and emphasize that this is a threshold issue that must be resolved in order to move forward with a consensual plan as both the Creditors and Debtor hopes to do: "As both sides have stated at the last two status conferences, a threshold issue for the Objections is to ***have disclosure and transparency with the Debtor's finances,*** something that does not exist in this case due to deficiencies and inconsistencies in basic information required by the Bankruptcy Rules and the Court's Local Rules." [Obj. ¶ 5; emphasis added]. The Debtor is working to answer all of the many questions presented by the Creditors and to correct any information that needs to be corrected, and has already provided the Creditors with significant additional information as Creditors themselves recognize. *See e.g.,* fn 2 ("the Debtor's new counsel provided the Objectors with a lengthy written explanation prepared ***by Marcum*** attempting to address some of these shortcomings and discrepancies").[2] Marcum's continued involvement has been critical to

---

[2] Creditors make unsubstantiated allegations in the Objection in a seeming effort to prejudice the Court against the Debtor, such as that the Debtor has "clearly operated at a loss" [Obj. ¶ 8] and that Creditors are concerned the Debtor may have its PPP forgiveness disallowed [Obj. fn. 2]. However, both PPP loans have been forgiven and Creditors have had documentation regarding the PPP forgiveness for over a month. Creditors also complain that Debtor's monthly reports show sales of $2,139,399 for 2021 but "the Debtor reported to the IRS sales of only $1,965,005." This sound and fury signifies nothing, as the difference is sales tax. Marcum has reconciled the tax returns and the monthly operating reports for Creditors. Marcum has been fundamental in clarifying questions like this one presented by Creditors, as Creditors are well aware. Finally, Creditors fail to acknowledge the well-known and obvious effects of the pandemic and its corresponding government restrictions. They want the Court to look at the Debtor's beginning performance during the pandemic in Bankruptcy as the indicator of the Debtor's likely future financial performance. However, it is illogical for anyone to look to the most extreme negative circumstances imaginable as a reasonable predictor, instead of the fact that the Debtor has operated for 9 ***years***. The Creditors know the most likely outcome for the Debtor is success now that the pandemic's worst effects appear behind us—which is likely why they intend to keep the property as a diner whether or not Debtor is at the helm as further discussed below.

addressing Creditors' questions and will continue to be critical with regard to whatever additional information Creditors seek. This is reason to grant Marcum's fee application rather than deny it.

9. Creditors contradict themselves by noting in the same paragraph that there "is no reason the newly retained professionals cannot wait the approximately four months since they have been retained to request fee awards," while also arguing that payment of Chapter 11 professional fees now will "reverse the priority under the Bankruptcy Code for professional fees of a chapter 7 trustee" if the case is converted. The chance that the case may be converted is therefore a reason to grant the interim fees now. Marcum, which jumped in on an emergency basis to help reorganize the Debtor, should not be forced to shoulder the risk of not being compensated—exactly as the case law recognizes.

10. The filing of the Objection is itself a further contradiction. Creditors note their concern that the "virtually all (if not even more)" of the Debtor's available cash will be used on professional fees and other administrative expenses. [Obj. ¶ 9]. However, the filing of the Objection, which Creditors themselves deem "limited" in that they only desire Marcum to delay its request, necessitated the filing of this Reply by Debtor. The drafting of such Reply has taken a substantial amount of time and effort away from answering the Creditors' other inquiries, as well as resulted in additional administrative fees on both sides.

11. In accordance with the Bankruptcy Code, case law, and the circumstances of the case, Marcum should be granted its fee request. There is more than sufficient unencumbered funds in the Debtor-in-possession account to do so. None of the Debtor's funds have been depleted during the pendency of the Bankruptcy. To the contrary, Debtor's estate has grown since the commencement of the case, especially after all of the pandemic restrictions on restaurants have

lifted. Marcum took on the financial burden of this case at a time when other accounting firm's declined the opportunity and should be reasonably compensated for its admirable efforts.

### III. Creditors' Lack Of Good Faith

12. As noted, Creditors contend the hypothetical conversion of this case to a Chapter 7 is a reason to deny Marcum's interim request for fees. The entire argument is a red herring raised by Creditors only to muddy the waters as to Debtor's overall case, and is largely irrelevant to the question at hand (except as a reason in favor of granting Marcum its earned fees as in *W. Farmers*). However, because it is asserted, Debtor must nevertheless point out the flaws in Creditors' analysis.

13. Creditors argue that the case may be converted because of an alleged "deemed rejection of the Lease." If the case fails on that basis, however, any hypothetical trustee will not have a lease to sell, either, and the Debtor's restaurant equipment will likely be worth little sitting in an abandoned restaurant facility along with the many other COVID-19 restaurant casualties.

14. Creditors seemingly admit outright their intention to do an about-face and offer the premises for lease in conjunction with a *Trustee* sale, even if they move forward with their motion seeking to terminate the lease with the *Debtor*, stating "There is **no** possibility that the diner is going to cease operating as a diner. The principals of the Objectors or their deceased husbands built the diner from a small donut shop and will not allow it to close. Either a trustee will sell it, they will sell it, or they will run it until it can be sold." [Obj. fn 3; emphasis added].

15. However, far from advancing their position that the case may be converted, Creditors' comments serve only to justify the disqualification of any future vote to reject Debtors' plan of reorganization because their comments demonstrate such vote would not be made in good faith.

16. A bankruptcy court may "designate" (*i.e.,* disregard) the votes of "any entity whose acceptance or rejection of [a] plan [is] not in good faith." *See e.g., In re DBSD N. America, Inc.*, 634 F.3d 79, 101 (2d Cir. 2011); *see also* 11 U.S.C. § 1126(e). Courts have developed "Badges of bad faith" to determine whether a vote is not made in good faith, including one designed to (a) assume control of the debtor, (b) put the debtor out of business or otherwise gain a competitive advantage, (c) destroy the debtor out of pure malice, or (d) obtain benefits available under a private side agreement with a third party that depends on the debtor's inability to reorganize. *See e.g., In re DBSD N. America, Inc.,* 421 B.R. 133, 138 (Bankr. S.D.N.Y. 2009). Although courts recognize the ability of courts to vote "selfishly" to maximize recovery on their claims, "a vote to block a reorganization plan in order to acquire the debtor company for one's self may justifiably result in disqualification of the vote." *Id.* Votes may also be disqualified where made with an "ulterior motive." *DBSD,* 634 F.3d at 102.

17. In discussing what qualifies as an ulterior motive, the Second Circuit noted that § 1126(e)'s very existence stems from a desire to prevent circumstances exactly like this one:

> The sort of ulterior motive that § 1126(e) targets is illustrated by the case that motivated the creation of the "good faith" rule in the first place, *Texas Hotel Securities Corp. v. Waco Development Co.,* 87 F.2d 395 (5th Cir.1936). In that case, Conrad Hilton purchased claims of a debtor to block a plan of reorganization that would have given a lease on the debtor's property—once held by Hilton's company, later cancelled—to a third party. *Id.* at 397–99. Hilton and his partners sought, by buying and voting the claims, to "force [a plan] that would give them again the operation of the hotel or otherwise reestablish an interest that they felt they justly had in the property." *Id.* at 398. The district court refused to count Hilton's vote, but the court of appeals reversed, seeing no authority in the Bankruptcy Act for looking into the motives of creditors voting against a plan. *Id.* at 400. That case spurred Congress to require good faith in voting claims. As the Supreme Court has noted, the legislative history of the predecessor to § 1126(e) "make[s] clear the purpose of the [House] Committee [on the Judiciary] to pass legislation which would bar creditors from a vote who were prompted by such a purpose" as Hilton's. *Young,* 324 U.S. at 211 n. 10, 65 S.Ct. 594.

*Id.* at 102-103.

18. Far from a reason to deny Marcum's interim fee request, Creditors' argument regarding a hypothetical conversion to Chapter 7 serves only to demonstrate that a plan of reorganization for the Debtor can and should be confirmed. Of course, the Debtor still hopes that what the "Objectors have been telling the Court [—] that they will continue to negotiate the terms of a consensual plan" [Obj. ¶ 11] is true, and that such a consensual plan will be reached. Debtor will continue to work with Creditors in furtherance of that goal.

### III. Responses To Alleged Deficiencies

19. Creditors also claim that the Fee Application has various deficiencies, and conclude that the interim fee application should therefore be denied and any corrections to the alleged deficiencies corrected in a final fee application. Specifically, Creditors contend that (a) Lasinsky's affidavit does not state the Debtor approved the amount sought in the Fee Application; (b) the time records are not broken down by projected categories; (c) the first time entry for the June invoice is for work on a "fee application," which does not make sense; (d) there are entries for preparing or discussing with Marcum professionals the firm's engagement letter, which is not compensable; (e) entries note a call or communication without a description of what was discussed or why the task required more than one professional; and (f) some entries are vague.

20. The Fee Application should not be denied on these bases. First, the Guidelines issued by Bankruptcy Court for Eastern District of New York (the "Guidelines"), to the best understanding of the undersigned after a review of the same, do not require that the Certification contain a statement that the Debtor approved the amount sought in the Fee Application. Rather, the Guidelines require that this information be provided in the Fee Application itself. The Fee Application complies with this requirement, noting in paragraph 41 that the "Debtor has had the opportunity to review the fee application and approve the amount of $33,483.50 requested by

Marcum, which covers Marcum's incurred fees for June and July 2022." To the extent this sentence is at all ambiguous, Debtor clarifies herein that it reviewed and approved the amount requested in the Fee Application prior to the filing thereof.

21. Second, contrary to the Creditors' assertion, the time records are broken down by projected categories. There is a column in the invoices identified as "Category." As further detailed in the Fee Application, there are six different categories in the two invoices: Employment, General, Fees, Projections, Landlord, and Court, and each time entry has a corresponding category.[3]

22. Third, upon information and belief, the June entry referring to the "fee application" was simply a clerical error meant to refer to the application to employ Marcum.

23. Fourth, Marcum should be reasonably compensated for the time referencing the firm's engagement letter. As the Court may recall, the U.S. Trustee had objections to certain substantive provisions of the firm's engagement letter and Marcum worked cooperatively with the U.S. Trustee to resolve those objections. However, the withdrawal of the provisions objected to by the U.S. Trustee varied from Marcum's ordinary practices and required the consideration of Marcum's in-house counsel. The Fee Application does not seek fees for the time expended by Marcum's in-house counsel, albeit Marcum believes it could appropriately do so. However, it does include time-entries related to its accountant's time spent conferring with in-house and Debtor's counsel regarding the U.S. Trustee's objections to the language in the engagement letter and, accordingly, Marcum's Employment Application itself. This time should be compensated as it complies with the Guidelines. In that regard, the Guidelines includes a list of suggested project categories for professional fee applications, which it notes may be used by all professionals as

---

[3] The Creditors also complain that the invoices are not chronological. However, that is precisely because the records are broken down by project categories, exactly as Creditors contend they should be. The time entries then appear chronologically within the corresponding category.

appropriate. One such category is "Employment Applications." These entries fall within that project category suggested by the Guidelines and should be allowed. Marcum was not billing for time spent drafting the engagement letter, but rather for the time spent resolving objections to its employment.

24. Finally, the few time entries of which Creditors complain are too vague are explained in conjunction with the category of services component that Creditors ignore. For instance, the 6/20/22 time entry by Lasinsky "Discussion with Gary Rosen regarding matter and telephone call with Phil Kalyvas" for .4 hours was related to the formulation of the projections, as indicated by the corresponding category.

## IV. Conclusion

25. Through Marcum's efforts, the Debtor was able to timely meet its obligations to file a plan of reorganization and disclosure statement and propose a 100% plan. The Debtor's ultimate success, which the Court has found to be more likely than not, will have been made possible only because of Marcum's involvement, which stepped in on an emergency basis when other accounting firms, including the Debtor's every day accountant, declined the opportunity to work with the Debtor due to the time constraints and expertise required.

26. The benefits to the Debtor were immense and indeed the Debtor very well may not have survived to today without Marcum's involvement. Instead, the Debtor hopes to confirm a 100% plan.

Wherefore, Marcum LLP respectfully applies to the Court for (a) an interim award of fees in the total net amount of $33,483.50; (b) an Order authorizing and directing the Debtor to make payment of the amount awarded when docketed per the Plan and his confirmation testimony; and (c) for all such other and further relief in their favor as this Court deems fair and just.

    Marcum LLP

    By: /s/Alanna G. Morgan

**Counsel for Sid Boys Corp**
Morgan & Bley, Ltd.
kmorgan@morganandbleylimited.com
amorgan@morganandbleylimited.com
900 W. Jackson Blvd., Suite 4E
Chicago, Illinois 60607
312.243.0006

Law Offices of Rachel L. Kaylie, P.C.
1702 Avenue Z, Suite 205
Brooklyn, NY 11235
P. 718.615.9000
Rachel@kaylielaw.com